OPINION OF THE COURT
Thomas J. McNamara, J.
This is a class action brought on behalf of those persons whose names appeared on the computer generated list produced by officials at the State University College at Oneonta and those persons alleged to have been wrongfully stopped, questioned and examined by law enforcement officials in connection with an investigation into an attack on an elderly woman in a residence just outside the City of Oneonta, Otsego County. The procedural history of the case is documented in the reports of the decisions of the Court of Appeals (Brown v State of New York, 89 NY2d 172 [1996]) and the Appellate Division (Brown v State of New York, 250 AD2d 314 [1998]; Brown v State of New York, 221 AD2d 681 [1995]; Brown v State of New York, 9 AD3d 23 [2004]). As a result of those decisions, only those claims by those who were stopped, questioned and examined remain and are limited to causes of action sounding in constitutional tort and negligent training and supervision of police officers and investigators. The constitutional tort claims are based on allegations of racially motivated violation of article I, § 12 of the New York Constitution (search and seizure) and racially motivated violation of article I, § 11 of the New York Constitution (equal protection of the law).
On Friday, September 4, 1992, a 77-year-old woman was attacked in a house in the Town of Oneonta, Otsego County, where she was staying as a guest. The attack took place in a first floor bedroom at about 1:30 a.m. but was not reported to the police until approximately 4:00 a.m. because after fighting off her attacker, the victim hid in another room unsure of whether the assailant had fled the scene. The incident was investigated by the New York State Police who interviewed the victim at the scene and later took her statement at the State Police barracks. In her statement, the victim indicated that she awoke to find the assailant on top of her. He held a knife in his left hand and told her to roll over and do as he told her. She saw only the left hand of her attacker, which she described as black, and recalled the timbre of his voice as that of a black male.
*635 Senior Investigator Herbert Chandler of the State Police Bureau of Criminal Investigations interviewed the victim at the scene. Chandler testified that the victim described the assailant as a black male with an Afro-American accent. According to Chandler, the victim also told him that she believed the attacker was young based on the agility he showed in his movements. At the scene Chandler found a trail of blood running from the victim’s bedroom, down the hall to the kitchen area, outside through a sliding glass door, across a stone patio and into the grass where the blood trail ended. Chandler concluded from the amount of blood on the bedroom doorknob and the sliding glass door that the assailant had probably cut his hand.
Based on the description provided by the victim, and the assumption that the assailant had cut his hand, Chandler directed the investigation toward identifying young black males in the area so as to check them for cut wounds to their hands or arms. State Police personnel as well as officers from the City of Oneonta Police Department and Otsego County Sheriffs Department were used in this effort. Members of the State Police were sent to the Oneonta bus station to see if anyone fitting the description of a black male with cuts to his hands or arms could be found there. Others were sent to the Oneonta Job Corps Center to interview three black male students identified as having been out of their dorm rooms that night without permission. A large group of students at the Job Corps Center who were going home for the Labor Day weekend were checked for cuts to their hands or arms. Black males identified by the Oneonta Police Department as having been involved in other criminal activity were interviewed. Oneonta police officers also went to the Rite-Aid Apartments to interview young black males because the address had been identified as a source of problems in the past.
The largest group of individuals sought to be interviewed was all 78 black male students at the State University of New York College at Oneonta (SUCO). Chandler testified that he asked Detective Shedlock of the Oneonta Police Department to contact the Public Safety Department Office at SUCO to determine the least disruptive way to interview black male students at the college. After receiving the request, the college administration generated a list of black male students and released it to the State Police. Utilizing the list, members of the State Police, Oneonta Police Department and Otsego County Sheriff’s Department, accompanied by members of the college’s Public *636 Safety Department, went to the dorm room of each black male student living on campus. Similar attempts were made to interview students on the list who lived off campus.
The owners of the house where the attack occurred told Chandler that some athletic teams jogged in the area and so, the coaches of the Hartwick College* and the Oneonta High School track teams were contacted. The Hartwick coach told police that there was one black member of the team whom the coach vouched for unconditionally. The high school coach told police that there were no black members of the track team. Other avenues of investigation were pursued but the assailant was never identified.
Search and Seizure
This cause of action is based on allegations that in carrying out the investigation the defendant violated article I, § 12 of the New York Constitution which secures the right of the people against unreasonable search and seizure. In determining whether a seizure occurred during the course of an encounter between the police and a private individual, the key question is whether there was a significant interruption of the individual’s liberty of movement (People v Bora, 83 NY2d 531, 534 [1994]; People v De Bour, 40 NY2d 210, 216 [1976]). The test is whether a reasonable person would have believed, under the circumstances, that the officer’s conduct was a significant limitation on his or her freedom (People v Bora, supra at 534). The determination is made based on an examination of the circumstances surrounding the encounter.
The search and seizure claim sounds in constitutional tort which is defined as an action for damages for violation of a constitutional right against a government or individual defendants (Brown v State of New York, 89 NY2d 172, 177 [1996]). The issue presented by this cause of action is whether the encounters between members of the class and the police rose to the level of a seizure which, under the circumstances presented, was unreasonable. Determination of that issue requires a two-step analysis: did any seizure occur and, if so, were there circumstances sufficient to justify such an intrusion.
Under New York law, an individual is seized if the police action results in a “ ‘significant interruption [of the] individual’s liberty of movement’ ” (People v Bora, 83 NY2d 531, 534 [1994], quoting People v De Bour, 40 NY2d 210, 216 [1976]). Not all *637 encounters with the police amount to seizures. In People v De Bour, the Court of Appeals set out a four-tiered method for evaluating the propriety of encounters initiated by police officers in their criminal law enforcement capacity. The first level is referred to as a request for information and that request must be supported by an objective, credible reason, not necessarily indicative of criminality. The second level of encounter is the common-law right of inquiry which requires circumstances which will support a founded suspicion that criminal activity is afoot. A forcible stop and detention of a person is authorized only where a police officer has reasonable suspicion that a particular person was involved in a felony or misdemeanor. Finally, where the officer has probable cause to believe that a person has committed a crime, an arrest is authorized.
A request for information “is a general nonthreatening encounter” (People v Hollman, 79 NY2d 181, 191 [1992]). The common-law right to inquire is a somewhat greater intrusion in that a police officer is entitled to interfere with a citizen to the extent necessary to gain explanatory information, but short of a forcible seizure (People v De Bour, supra at 223; People v Marshall, 5 AD3d 42, 45 [2004]). A seizure occurs only when the intrusion reaches the level of a tier three intervention under De Bour (People v Jenkins, 209 AD2d 164, 165 [1994]). While tier one and tier two encounters have become important tools in determining suppression issues in criminal prosecutions, they represent a state common-law approach adopted to protect the individual from arbitrary or intimidating police conduct rather than a result compelled by the specific language of the State Constitution (People v Hollman, 79 NY2d 181, 195 [1992]).
Here, because the cause of action under consideration is a constitutional tort, claimants must establish violation of the asserted constitutional right: freedom from unreasonable seizure. Proof that an encounter with the police involved a request for information or a common-law inquiry will not suffice even if claimants show that the circumstances did not justify either level of intrusion. Though tier one and two encounters may involve police conduct which violates state policy as reflected by the common law, they do not constitute seizures and therefore, cannot be viewed as violations of the protection afforded by the Constitution. Nor would such violations be covered by the causes of action pleaded in the claim.
Each lead generated as part of the investigation was related to the conclusion that the perpetrator was a black male proba *638 bly with cuts on his hands or arms. This evidence, that a black male had broken into a residence and possibly suffered cuts to his hands or arms, was insufficient to support a reasonable suspicion that any particular individual the police sought to interview was involved in the crime. Therefore, the information available to police as they conducted interviews would not support a seizure unless some further evidence was developed during the course of the interview. No such occurrence has been shown. Consequently, if in carrying out the investigation police conduct created a significant interruption of an individual’s liberty of movement, liability may be found.
The inquiry into whether a seizure has occurred involves consideration of all the facts and a weighing of their individual significance: was the officer’s gun drawn, was the individual prevented from moving, how many verbal commands were given, what was the content and tone of the commands, how many officers were involved, and where the encounter took place (People v Bora, 83 NY2d 531, 535-536 [1994]). Claimants’ proof as to liability respecting the class came from testimony by law enforcement personnel involved in the investigation and four members of the class.
After Chandler returned to the State Police barracks from the crime scene, he set up a lead desk. Information was placed into a personal computer and lead sheets were prepared, printed and assigned either by Chandler or Bureau of Criminal Investigation (BCI) Investigator John Way. Chandler testified about a variety of leads that were generated. Neighborhood interviews were conducted, hospitals were checked to see if anyone had come in for treatment of cuts to the hand or arm and convenience stores and drug stores were checked to see if anyone fitting the description had been in to purchase supplies to treat cuts. Investigators checked with taxi operators and a fixed post was set up at the Oneonta bus station to look for young black males with injuries who were leaving town. Attempts were made to identify and interview individuals who fit the physical description and had prior convictions for sex crimes or burglaries. Investigators were sent to the Oneonta Job Corps Center to interview three black male students who had been out of their dorm rooms without authorization on the night of the attack. BCI investigators were also sent to the Job Corps Center to observe students who were boarding a bus to go home for the weekend.
Chandler also asked Detective Shedlock of the Oneonta Police Department to determine how students of the SUCO could be *639 interviewed. Shedlock contacted Lieutenant Merritt Hunt of the University Police at about 8:00 a.m. on September 4, 1992 and requested help identifying black male students. Hunt determined that the college’s computer services office could produce such a list. Leif Hartmark, vice-president of finance and administration, and the college’s officer-of-the-day at the time, gave permission to produce the list and release it to the State Police. The list was used to generate lead sheets which were then assigned for investigation.
Chandler testified that he assigned officers from the Oneonta Police Department, Otsego County Sheriff’s Department and the State Police to conduct the on-campus interviews. According to Chandler, those interviews were conducted during a two-hour period beginning at about 4:30 p.m. on September 4, 1992. Hunt testified that officers from the college’s Public Safety Department were assigned to accompany outside law enforcement personnel to the dormitories to conduct interviews of students on the list. According to Hunt, the assignments lasted from 5:00 p.m. to 6:50 p.m. Interviews of black male students living off campus were attempted the following day. On September 9, 1992 interviews of all students living in five of the dormitories on campus were pursued after a janitor found bloody towels under a bush or tree near one of those dormitories.
According to Chandler, the investigators going to the Job Corps Center were told to identify themselves, explain the crime in detail, explain why they were there, ask for cooperation and attempt to look at hands. Investigators Robert Hernandez and Kevin More testified that they went to the Job Corps Center and watched as a group of students were boarding a bus to go home for the weekend. Both investigators described a scene in which students, mixed as to both race and sex, filed past the investigators and showed their hands and arms in what became a playful atmosphere. Significantly, no students at the Job Corps Center testified nor were any Job Corps Center students made members of the class.
Chandler also testified that investigators going to do interviews at the college were told to meet with dorm supervisors who would then contact students and ask them to come down to the office or other meeting place to be interviewed. According to Chandler, the investigators were not to go to student rooms. Chandler then testified that he spoke with dorm supervisors who told him that this is how it was done. Sean Ralph, an investigator with the Otsego County Sheriffs Department, testi *640 fied that he went to dorms to interview black male students. And, though he testified that he did not remember going to dorm rooms to do interviews, he testified that he was not given instructions on how to conduct interviews.
Hunt testified that he accompanied State Police members on campus while they conducted student interviews. According to Hunt, the officers went door-to-door through various dorms and spoke to more or less everyone they came in contact with. Although Hunt was unsure of the date of this activity, other evidence makes clear that his testimony referred to canvassing done on September 9th after the bloody towels were found outside Huntington Hall.
William Davis, a detective with the Oneonta Police Department, testified that he went on campus to conduct interviews on September 4th. Davis testified that they went directly to the students’ rooms where they would describe the crime, give a description of the accused, ask the students where they were at the time of the crime and ask to see their hands. Investigator George Clum of the State Police also went on campus to conduct interviews on September 4th. Clum’s interviews were done in the dorm rooms where he would introduce himself, explain the crime and that the suspect was a young black male with arm injuries. According to Clum, everyone cooperated when he asked to see their arms.
In September 1992 Richard Hodges was the Station Command Sergeant at Troop C in Oneonta. On September 4, 1992 he was sent to the Oneonta bus station by Chandler to look for anyone matching the description of a young black male with a bandaged or injured hand or arm. Hodges was at the bus station for about two hours and checked three buses. He didn’t see anyone matching the description and he testified that he did not have direct contact with anyone at the bus station. Three other members of the State Police, Ken Rose, Kenneth Grant and Peter McCann, testified that they went to the Oneonta bus station on September 4, 1992 to see if anyone fitting the description of a black male with cuts to his hands or arms could be found there. Each of them testified that, while there, they did not see anyone fitting the description.
Sheryl Champen-Brown was the assistant director of admissions at SUNY Oneonta in September 1992. On September 4, 1992 she went to the Oneonta bus station to catch a bus to New York City. When she came out of the terminal she noticed a State Trooper standing in front of the door of the bus she was *641 going to board. She stood in line behind an African-American male. The trooper was standing in front of that person who was at the head of the line. When it came time to board the bus the man in front of Champen-Brown was told by the trooper that he would have to show identification to get on the bus. When the man turned to Champen-Brown and commented about having to show identification, she told him that she thought they were investigating a burglary, something someone inside the terminal had told her, and that he should show his identification so they could get on the bus. After the man showed his identification, the trooper asked him to show his hands which he did. The trooper then asked Champen-Brown for identification. She showed him the identification and showed her hands without being asked. She then boarded the bus.
Hopeton Gordon testified that he was in his dormitory suite on Saturday morning getting ready to go to an educational opportunity program class when he heard a knock at the door. He asked who it was and the reply was “Public Safety Officer.” When Gordon opened the door the Public Safety Officer asked if he was Hopeton Gordon and then the officer and two others came into the common area of the suite. All three individuals were in uniform and only the one who identified himself as a Public Safety Officer was not wearing a weapon. Gordon was asked where he was the previous night and he told them that he was in his room. When asked if anyone could corroborate that, Gordon told them no. To that point he did not know why the officers were there. When one of the officers asked to see Gordon’s hands, Gordon asked why and was told that they were investigating a crime that happened off campus. Gordon showed them his hands, they thanked him for his cooperation and left. Although Gordon testified that the encounter lasted between two and 20 minutes, based on his description of the event it was relatively brief.
Ricky Brown testified that somewhere between 2:00 a.m. and 3:00 a.m. on September 5, 1992 he was walking on campus when he was stopped by police officers. Brown testified that he was on his way back to his dorm coming from downtown when he saw a police cruiser parked near Golding Hall. As he walked along the sidewalk past the cruiser he saw an officer inside reading. The cruiser then drove away to the top of the street and made a U-turn. The cruiser came back to where Brown was walking and stopped. The officer got out and asked to talk to Brown. The two met near the middle of the street. As the offi *642 cer asked Brown his name and where he was coming from, another cruiser pulled up and the interrogation stopped as they waited for the other officer to join them. Soon, a third officer joined them though Brown was not sure where he came from. With three officers now standing in front of him, the officer in the middle again asked Brown his name. Brown answered. He was also asked where he lived, where he was going and where he had come from. He then was asked for his SUCO identification card. Brown handed the officer his identification card which was then passed around and returned to the officer in the middle. The officer scratched the card, declared it real and returned it to Brown. They stood there in silence for a moment and then Brown asked if he could leave. No one said anything but the officers moved and made a space for him to pass through. As he reached the other side of the street, one of the officers called for Brown to come back. Brown stopped and asked him what he had said. The officer replied “let me see your hands.” The officer rolled up his sleeves showing Brown what he wanted him to do. Brown rolled up his sleeves but was told to come over by the officers and do it. He walked back over to the officers and rolled up his sleeves. One of the officers looked closely at his forearms and hands and then told him he could go home. Brown testified that he was never given an explanation as to why he was stopped.
The testimony of Jean Cantave was placed in evidence by introducing the transcripts of two depositions he gave: one in April 2002 and the other in June 2005. Cantave testified that sometime in early September 1992 he was driving from the SUNY campus to his apartment downtown when he was pulled over by an officer from the Oneonta Police Department. He was asked for his license, registration and student identification card. He wasn’t told why he had been stopped. He was asked to step out of the car and to show his hands, which he did. His license, registration and identification card were returned to him and he got back in his car and left.
Because the determination of whether a seizure occurred is always fact specific, claimants’ burden in attempting to establish liability for the class as a whole is a difficult one. To support a finding of liability to the class as a whole, the proof must show facts making it more likely than not that each member of the class suffered a significant interruption of his or her freedom of movement (see Mazzocki v State Farm Fire & Cas. Corp., 1 AD3d 9 [2003]). Viewed as a whole, the proof falls short of establishing liability as to the class.
*643 Police testimony as to the manner in which individuals who fit the description were questioned does not support the claim that all such interviews amounted to seizures. The testimony by police investigators lacks information about circumstances important in determining whether an individual was seized: was the officer’s gun drawn, was the individual prevented from moving, how many verbal commands were given, what was the content and tone of the commands and how many officers were involved (People v Bora, 83 NY2d 531, 535-536 [1994]).
The testimony by the four members of the class includes more information as to the specifics of each of their encounters. However, the proof as to the circumstances of the four encounters with the police does not satisfy the burden with respect to the claims of the class as a whole. The testimony by the four class members does not establish by a preponderance of the evidence, collectively and in combination with the police testimony, that each member of the class was subjected to a significant limitation on his or her freedom. Absent testimony from each member of the class, the claim could only be established by testimony tending to show that the police conducted all interviews under circumstances which amounted to unreasonable seizures. That proof is lacking.
Nonetheless, the court has the power to sever the claims of the individual class members who testified. In that regard, the individual claim by Sheryl Champen-Brown was severed at the conclusion of the trial and a finding of liability was made in her favor.
The interview of Hopeton Gordon was conducted by three police officers at least one of whom was a member of the college’s Public Safety Department. The questioning took place in his dormitory room and was limited to questions regarding his identity, his whereabouts on the night of the attack and a request that he show the officers his hands. Though Gordon testified that he was understandably scared, the encounter was brief, he was told the reasons for the questions and the tone of the questions has not been shown to have been forceful or intimidating. Furthermore, to the extent that Chandler’s testimony that he instructed investigators not to go to individual dorm rooms is accurate, the fact that such a directive was violated is not relevant to a determination of whether the encounter amounted to a seizure. While the encounter involved more than a request for information and took on an accusatory tone, it did not amount to a seizure.
*644 Ricky Brown encountered the police as he walked on campus to his dormitory. It was late at night and he was confronted by three police officers who created a barrier to his movement. There were at least two police cruisers at the scene and one had its lights on. Brown was standing in the middle of the street when he was asked questions regarding his identity and destination. However, no explanation was given for the questioning and he was only allowed to move on after asking if he was free to do so. Even then, he was called back and told to show the officers his hands. A reasonable person in those circumstances would not have felt free to leave particularly after the command to show the officers his hands. Although Brown could not identify the officers who stopped him as being from a particular police agency, Lieutenant Merritt Hunt of the SUCO Public Safety Department, testified that Public Safety Officers patrolled the campus in September 1992.
Jean Cantave was stopped while driving his car. The stop of an automobile is a seizure implicating constitutional limitations (People v Spencer, 84 NY2d 749, 752-753 [1995]). However, Cantave testified that he was stopped by an officer from the Oneonta Police Department without the involvement of any officer employed by the State.
While it is the general rule that an employer will be held vicariously liable for an employee’s torts (Adams v New York City Tr. Auth., 88 NY2d 116, 119 [1996]), because the officer was not a regular employee of the State, the defendant cannot be held liable as the general employer. Nonetheless, a general employee of one employer may also be in the special employ of another (Thompson v Grumman Aerospace Corp., 78 NY2d 553, 557 [1991]). A special employee is described as one who is transferred for a limited time of whatever duration to the service of another (id. at 557). A number of factors go into the determination as to whether an individual is a special employee of another and the question of who controls and directs the manner, details and ultimate result of the employee’s work has been identified as a significant factor in that determination (id. at 558). Thus, when Chandler requested the assistance of law enforcement personnel from the Sheriffs Department and the Oneonta Police Department to conduct on-campus interviews and gave instructions as to how the interviews were to be conducted, a special employment relationship may have been created. However, there is no evidence that Chandler, or any other state employee, requested that traffic stops be made in *645 furtherance of the investigation. Moreover, there is no proof of the presence of any other factor relevant to the determination of whether a special employment relationship existed regarding the Cantave traffic stop. Consequently, the defendant may not be held liable for the seizure that occurred when the vehicle Cantave was driving was stopped.
Equal Protection
Section 11 of article I of the State Constitution provides:
“No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state.”
The first sentence of the section is an equal protection provision which provides protection equivalent to that of its federal counterpart and, like the federal provision, is addressed to state action (People v Kern, 75 NY2d 638, 650-651 [1990]; Under 21, Catholic Home Bur. for Dependent Children v City of New York, 65 NY2d 344, 360 [1985]). Here, claimants contend, by their proof and arguments, that the State violated their right to equal protection of the law when the police created an express racial classification by carrying out an investigation in which all black males in Oneonta were pursued for questioning.
Whether an express racial classification was created by the manner in which the investigation was conducted requires a review of the investigative procedures used by the police. One of the first steps in the investigation was to set up a fixed post at the Oneonta bus station. Chandler testified that the objective was to check for young black males with injuries who might be leaving town. Richard Hodges and three other members of the State Police, Ken Rose, Kenneth Grant and Peter McCann, testified that they went to the Oneonta bus station on September 4, 1992 to see if anyone fitting the description of a black male with cuts to his hands or arms could be found there.
Three black male students at the Job Corps Center who had been out of their rooms on the night of the attack were interviewed. None of them were over 19. A black male Job Corps Center student who had obtained Band-Aids from a teacher, and then was seen giving them to another black male student who had an injury to his arm, was interviewed as was the individual with the arm injury. In excess of 250 Job Corps Center *646 students who were leaving for the weekend were checked for cuts to their hands or arms. Although the age of these individuals is not shown by the evidence, participants in the program were, with limited exceptions, between the ages of 16 and 21 at the time of enrollment (29 USC § 2884).
The list of black male students attending SUCO contained 78 names. A third of them were interviewed. Of those whose dates of birth appear on the lead sheet prepared by the police after the interview, all were in their early-to-mid 20s.
Three young black males identified by the Oneonta Police Department were interviewed. Detective Davis testified that one had a prior arrest for a knife crime, another had been arrested for rape and the third for possession of a controlled substance. Police also went to a residence known as the Rite-Aid Apartments to interview black males who resided there. All but one, who was 29, were in their early 20s. Two female residents of the apartments, both of whom were white, were also interviewed. Five individuals found at 187 Chestnut Street in Oneonta, three black males, a black female and a white female, were also interviewed. None of these individuals were over 21.
Three black males living at 29 Cedar Street were interviewed and checked for cuts. These men, who were doing contracting work at the Job Corps Center, were ages 45, 36 and 25.
Two young white males who had been doing work for a surveyor in the area where the attack occurred were interviewed. Both had reported injuries to their employer and were checked for cuts.
An employee of the D&H Railroad was interviewed. He reported seeing a black male on a freight train at around noon on September 4, 1992. He recalled that the man was in his 40s or 50s. No further attempts were made to locate the individual.
Other steps were taken to identify the assailant. Area hospitals and the SUCO infirmary were alerted to look out for someone with injuries of the kind suffered by the perpetrator. Local convenience stores and drug stores were checked to see if anyone had purchased supplies to treat cut wounds. The local taxi company was asked if any fares fitting the description of the assailant had been picked up during the night.
In attempting to identify individuals who fit the description obtained from the victim, the police went to places such as the local colleges and the Job Corps Center where those they sought *647 to interview were more likely to be young. No attempt was made to identify black females at those institutions and no attempt was made to identify black males at those institutions, such as administrators or educators, who were likely to be older. While two older black males who were doing construction work at the Job Corps Center were interviewed and examined, Chandler testified that those conducting the investigation were told by people at the Job Corps Center that all three workers were young. Two young males who had been doing surveyor work in the area of the attack and had reported injuries were interviewed and checked though they were white. These leads were all pursued under circumstances which indicate that in pursuing the assailant the police did not focus exclusively or predominately on race.
The incidents involving class members Brown, Cantave and Gordon, who presented proof of their individual encounters with the police, are also consistent with the claim that the investigation focused on young black males. Though the accounts are credible, and the street stops involving Brown and Cantave extend beyond the investigative methods that Chandler described, there is no proof that this tactic was used in any other instance much less to pursue any black male found in Oneonta.
One instance stands out as having been racially motivated: the action of the unidentified State Trooper in requiring Sheryl Champen-Brown to present identification and show her wrists before boarding a bus. There is no reason, other than race, that Champen-Brown was made to do so. She is a female and was 31 years old. The only physical characteristic that clearly connected her to the description of the assailant was race. Moreover, Champen-Brown testified that of those boarding the bus only African-Americans, including two other women, were made to show identification and their wrists.
Although black males in Oneonta were widely sought for questioning, the proof does not establish an express racial classification as to the members of the class. The bus station incident involving Champen-Brown, though egregious, is insufficient to show that the investigation focused solely or predominantly on the fact that the perpetrator was black while discounting the nonracial elements in the victim’s description (see Brown v City of Oneonta, New York, 235 F3d 769, 782 [2d Cir 2000, Calabresi, J., dissenting]). Inasmuch as the character of the investigation as a whole did not create an express racial clas *648 sification, the State is not liable to the class as a whole for violation of equal protection rights.
However, Champen-Brown’s individual claim that her right to equal treatment under the law was violated brings a different result. The trooper at the bus station was possessed of state authority and was acting under that authority when he demanded identification and an examination of her wrists as a condition of boarding the bus. Consequently, his action was state action (see Griffin v Maryland, 378 US 130, 135 [1964]). In addition, he acted solely on the basis of Champen-Brown’s race, an express racial classification. In the absence of a compelling state interest for the race based classification, the State is liable for a violation of her constitutional rights (see Alevy v Downstate Med. Ctr. of State of N.Y., 39 NY2d 326, 334 [1976] [strict scrutiny of racial classifications]). The State has not attempted to offer any explanation for this conduct and, accordingly, it is liable to Champen-Brown for the trooper’s actions.
Defendant has raised the doctrine of qualified immunity as a defense to the claims based on violation of equal protection rights. “ ‘A government official performing a discretionary function is entitled to qualified immunity provided his or her conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known’ ” (Doyle v Rondout Val. Cent. School Dist., 3 AD3d 669, 670-671 [2004], quoting Liu v New York City Police Dept., 216 AD2d 67, 68 [1995], lv denied 87 NY2d 802 [1995], cert denied 517 US 1167 [1996]). To be entitled to qualified immunity, it must be established that it was objectively reasonable for the police officers involved to believe that their conduct was appropriate under the circumstances, or that officers of reasonable competence could disagree as to whether their conduct was proper (id. at 670). No objectively reasonable basis has been offered for the trooper demanding that Sheryl Champen-Brown, an African-American woman, show identification and bare her wrists in circumstances in which all agree that the police were searching for a black male.
Negligent Training and Supervision
An employer can be held liable for its employee’s torts under theories of negligent hiring and supervision in instances where the employer cannot be held vicariously liable for the employee’s actions (see State Farm Ins. Co. v Central Parking Sys., Inc., 18 AD3d 859, 860 [2005]). A necessary element of such causes of action is that the employer knew or should have known of the *649 employee’s propensity for the conduct which caused the injury (id. at 860).
Here, all of the allegedly tortious acts of either general or special employees were carried out in the scope of their employment and therefore, the defendant is open to vicarious liability for those acts (id. at 859). Consequently, the causes of action for negligent hiring and supervision are not available to claimants. In addition, claimants failed to offer any proof that supervisory personnel were aware or should have been aware that any of the police officers participating in the investigation had a propensity for violating constitutional rights in carrying out their duties. Accordingly, the causes of action for negligent training and supervision fail.
Summary
The claims on behalf of the class for violations of article I, § 12 of the New York Constitution (search and seizure) and violations of article I, § 11 of the New York Constitution (equal protection of the law) are dismissed. Liability is found with respect to the individual claims of Sheryl Champen-Brown for violation of her constitutional rights under both the search and seizure and equal protection provisions of the State Constitution. Liability is also found with respect to the individual claim of Ricky Brown for violation of his constitutional rights under the search and seizure provision of the State Constitution. All remaining individual claims based upon constitutional tort are dismissed as are all claims for negligent training and supervision.
The motion by defendant to decertify the class is denied as is the cross motion by claimants for summary judgment.

 Hartwick College is located approximately two miles from the crime scene.