Alexander **ALHOVSKY**, Plaintiff,

v.

Thomas **RYAN**, New York City Police Department Detectives Steven Goetz and Jose M. Alfonso, New York City Police Department Officers Sgt. Panuccio, Paul, Mornzani and Gaven, Jack T. Linn, Steve Simon, Ray Brown, Barbara Joyner, the New York City Department of Parks and Recreation, and the City of New York, Defendants.

No. 07 Civ. 7628(CM).

United States District Court, S.D. New York.

Aug. 7, 2009.

---

Robert Keith Erlanger, Erlanger Law Firm, PLLC, New York, NY, for Plaintiff.

Dara Lynn Weiss, City of New York Law Department, Jeffrey Anthony Dougherty, NYC Law Department, New York, NY, for Defendants.

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge:

*The Facts*

Alexander Alhovsky is a professional clown and magician. He spends his days in Central Park, entertaining children; he commutes to work on his bicycle. One of Alhovsky's specialties is creating balloon animals. In this line of work, one needs either an extremely powerful set of lungs or a mechanical device that can blow up lots of balloons. Alhovsky uses the latter: a Majiloon battery-powered balloon inflation pump. He carries the pump in a Majiloon-issued fanny pack; the air hose, which was painted with the colors of the rainbow, protrudes from the pack and hangs alongside it.

On June 25, 2006, Alhovsky left Central Park after a long day of making balloon animals and painting children's faces. He rode his bike to a Starbucks located at 1128 Third Avenue, which he was known to frequent. When he went in (around 6 PM), plaintiff followed his usual routine: he ordered a drink and something to eat; he sat at the counter in the front of the store, where he consumed his meager repast; and he chatted on his cell phone. When he sat down, Alhovsky took off the heavy and cumbersome fanny pack and placed it on the counter in front of him. When he got up to leave (at 6:19 PM), Alhovsky forgot to pick up the fanny pack. He walked out of the store, retrieved his bike and rode away.

The store closed at 10 PM. For nearly four hours the fanny pack, with the rainbow colored air hose protruding, sat on the counter. No one bothered it, and apparently no one was bothered by it.

At closing time, the shift manager for Starbucks noticed the fanny pack and opened it. Inside, she saw a mechanical device with wires protruding from it, Thinking it might be a bomb, the manager showed it to a co-worker, who immediately (1) threw the fanny pack out of the store onto the sidewalk (!) and (2) called 911. The Bomb Squad arrived shortly thereafter.

The Bomb Squad disconnected the battery from the pump, but quickly ascertained that the fanny pack contained no explosives. Deeming the package a "possible hoax device," the Bomb Squad turned the investigation over to the 19 Precinct Detective Squad.

If the fanny pack had been deliberately placed in a Starbucks by someone who knew, intended or reasonably believed that people would think it was a bomb, then the person who placed it on the counter might well have done so in violation of New York Penal Law § 240.62 (Placing a false bomb or hazardous substance in the first degree), which provides:

A person is guilty of placing a false bomb or hazardous substance in the first degree when he or she places, or causes to be placed, in or upon school grounds, a public building, or a public place any device or object that by its design, construction, content or characteristics appears to be or to contain, a bomb, destructive device, explosive or hazardous substance, but is, in fact, an inoperative facsimile or imitation of such a bomb, destructive device, explosive or hazardous substance and which he or she knows, intends or reasonably believes will appear to be a bomb, destructive device, explosive or hazardous substance under circumstances in which it is likely to cause public alarm or inconvenience..... Placing a false bomb or hazardous substance in the first degree is a class D felony.

It thus fell to the 19th Precinct police to figure out whether the abandoned fanny pack was placed on the Starbucks counter in order to create a bomb scare or for some innocent reason.

Plaintiff did not return to Starbucks looking for his fanny pack; he forgot that he had taken it off there and assumed that it had been stolen from his apartment. Fortunately (or unfortunately) for Alhovsky, he had another pump, so he just went to work the next morning....and the morning after that.....and the morning after that.

Meanwhile, the police were looking for him.

The lead detective on the investigation was Steven Goetz. He reviewed tapes from the four surveillance cameras at the Starbucks. He saw his man come in wearing the fanny pack, order (glancing over his left shoulder for a moment as he did so), sit down and eat. He learned that Alhovsky was a regular customer of the Starbucks who was non-threatening and who had never caused any trouble. No one had communicated any threats directed at Starbucks (that one or any of the hundreds of others located on practically every block in Manhattan) or at any other target in the 19th Precinct.

Goetz wanted to talk to Alhovsky, but he had no intention of arresting plaintiff, because he did not believe plaintiff to be dangerous. He did, however, need to identify the mystery man, and find out why the package had been left on the counter. So Goetz prepared a poster, known as a "field information" poster, showing Alhovsky's picture (from the security tapes). He handed the poster to all patrol officers at roll call before their tour commenced on June 27. He told the officers that the person on the poster had left some kind of device at the Starbucks and said he wanted to talk to him about it. It was obviously not a run-of-the-mill case in the 19th; many officers became involved in the hunt for Alhovsky, and the situation created "quite a stir" within the precinct.

Despite all this attention, nothing happened until the end of the day on June 28, three days after Alhovsky had his coffee and danish and left the fanny pack on the counter. When it happened, Goetz was not there; he finished his tour of duty at 4 PM that day, left the precinct and had no further involvement in the case.

At 4:15, Detective Jose Alfonso and SGT Panuccio, working together, staked out the Starbucks to see if the mysterious "regular customer" would pass by.

He did.

Alhovsky had worked in Central Park that day, using his back-up balloon pump. He rode toward his apartment, the back-up pump in its fanny pack strapped around his waist, an artist's portfolio bag strapped to his back, and his multicolored balloon hamper attached to the bike's handle bars. Alfonso spotted him at 6:26 PM and issued

a radio call, altering police officers that Alhovsky was cycling down 66th Street toward First Avenue. Alfonso added a warning to officers to be "careful," because he did not know what Alhovsky had on him.

Police Officers Timothy Gaven, Timothy Morenzoni[1] and Christopher Paul, who were on bike patrol, heard the call while in a local delicatessen. They biked toward 66th Street, where Gaven saw Alhovsky coming toward him. Gaven got off his bike, drew his gun and pointed it at Alhovsky. Morenzoni, who was on the other side of the street, crossed over and drew his weapon as well.

Plaintiff saw the officers on bicycles screaming, but did not think they had anything to do with him. Eventually he realized that the screaming "might be relevant" to him, so he slowed his bike.

We have now reached the end of the undisputed facts. Since defendants have moved for summary judgment, I will continue with plaintiff's version, since I must view the facts most favorably to the non-moving party.

Alhovsky did not get off his bike voluntarily, although he may have been ordered to do so. He was knocked off or grabbed off the bike. He was punched in the kidney and fell to the ground, landing on his shoulder. One officer screamed that he was going to "blow his fucking head off" while another officer put a knee in his face. He was handcuffed and kicked. His pants fell down, exposing his genitals to children playing across the street, some of whom he recognized as "clients."

Alhovsky was "in shock" and wanted the officers to "stop hurting me." He was afraid that he "might not even survive this." (Alhovsky EBT, Erlanger Ex. 1)

Alhovsky was pulled up by his hair and slammed against the window of a Chirping Chicken store. The owner of the store, Maria Psaris, who knew Alhovsky as a customer, saw plaintiff's face being slammed against the 66th Street window while his hands were cuffed and he was on his knees. Psaris also saw one officer with his weapon drawn. (Erlanger Ex. 2).

When Alfonso arrived at the site, Alhovsky was on the ground surrounded by police officers. Alfonso removed the fanny pack from Alhovsky's waist and called Emergency Services. The NYPD cordoned off the area around the fanny pack and forced everyone in nearby stores to evacuate while the Bomb Squad investigated the package.

Detective Thomas Ryan heard Alfonso's call from the precinct, where he was working. He found a car and drove to the site, where he saw Alhovsky in handcuffs standing next to a departmental vehicle. Ryan put Alhovsky in the back of his car.

No one, it seems, took the time to ask plaintiff any questions—not Alfonso, not Ryan or Detective Staller (who accompanied Ryan on the drive back to the precinct), not any of the officers who responded to the radio call. When Alhovsky asked why he was being treated in this manner, he was either ignored or told to "shut the fuck up."

Once he arrived at the 19th, Alhovksy was placed in an interrogation room. His pockets were emptied and his shoe laces removed. Alfonso and Ryan went in and out of the room, one being a "good cop" and the other a "bad cop;" neither would explain why he had been arrested. When Alhovsky asked Alfonso for a hint, like was he arrested for something serious like

---

1. Officer Morenzoni is erroneously sued as Officer "Mornzani." The court has corrected the caption.

murder or rape, Alfonso replied, "you're in far deeper shit than this, buddy, and you're going in for life." Another detective said something about expecting a "bigger fish."

Eventually, a man with a different gold badge walked in with the fanny pack and asked, "What is this and where did you get it?" Alhovsky—who was never told that the police thought a bomb or a fake bomb might have been left at Starbucks—replied, "It is a balloon pump." He suggested that "gold shield" check out the Majiloon website. "Gold shield" and another detective logged onto the web sight and saw the very product they were holding in their hands.

At some point Ryan convinced (or coerced, depending on whose view of the matter you take) Alhovsky into granting the NYPD written permission to search his apartment. According to plaintiff, Ryan told him that the police would get a warrant if he did not consent. Plaintiff accompanied the police to his building, where he waited outside while a bomb-sniffing K–9 inspected the apartment. The police found nothing and left—incident over.

Not quite.

Plaintiff sues the City of New York and everyone involved for false arrest and excessive force. Everyone involved asserts that there was no constitutional violation, no personal involvement, or entitlement to qualified immunity; most of the individual defendants assert all three.

Defendants move for summary judgment. The motion is granted in part and denied in part.

## DISCUSSION

### Standards for Summary Judgment

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. United States Veterans Admin.*, 870 F.2d 57, 60 (2d Cir.1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Finally, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industries Co.*, 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the non-movant.

Defendants' motion can be broken into five separate applications.

(1) Individual defendants Ryan, Goetz, Panuccio and Alfonso move for summary judgment dismissing the excessive force claim against them on the ground that they were not present at the scene of plaintiff's arrest and so neither used force on him nor were in a position to prevent the use of force by brother officers. That motion is granted.

(2) Individual defendants Gaven, Morenzoni and Paul move for summary judgment dismissing the excessive force claim against them on the ground that (1) the force they used was not excessive; and (2) qualified immunity shields them from liability, because a reasonable officer confronted with the situation in which they found themselves could have concluded that the force used was needed to subdue plaintiff. That motion is denied.

(3) All individual defendants move for summary judgment dismissing the false arrest claim on the ground that the arresting officers had probable cause, or at least arguable probable cause, to arrest plaintiff. That motion is granted.

(4) All defendants move to dismiss plaintiff's claim for intentional infliction of emotional distress. That motion is granted.

(5) The City of New York (which includes both the City and its Police Department, an agency that cannot be sued in its own name) moves for summary judgment dismissing the Fifth Claim for Relief against it. That motion is granted.[2]

*Plaintiff's Claim for False Arrest/False Imprisonment*

Plaintiff asserts claims for false arrest and false imprisonment under both federal and state law.

*The Police Had Probable Cause to Arrest Plaintiff*

■ Plaintiff argues that the police lacked probable cause to arrest him for the crime of placing a false bomb or hazardous substance in the first degree. Defendants argue that they had probable cause for the arrest, and also that they are entitled to qualified immunity because they had, at the very least, arguable probable cause to arrest plaintiff.

Defendants are correct. The court believes that they had actual probable cause to arrest Alhovsky for the crime of placing a false bomb or hazardous substance in the first degree; however, at the very least, they had arguable probable cause to arrest Therefore, plaintiff's false arrest claim must be dismissed.

■ It is axiomatic that the police cannot arrest a person unless they have probable cause to believe that he has committed a crime. *See Gerstein v. Pugh,* 420 U.S. 103, 111–112, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). Probable cause must extend to every element of the crime for which a person is arrested. When an arrest is made, the police officer must have reasonably believed that each element of the criminal offense for which the arrest was made was committed. *See Zellner v. Summerlin,* 494 F.3d 344, 372–77 (2d Cir.2007).

■ However, if it was objectively reasonable for an arresting officer to believe that probable cause existed, or if officers of reasonable competence could disagree on whether the probable cause test was met, then an officer defendant who reached the same conclusion is entitled to the protection of qualified immunity against a claim of false arrest. *Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir.2004);

---

**2.** To the extent that the Fifth Claim is related to the Parks Department aspects of this case, it has already been settled.

*Finigan v. Marshall,* 574 F.3d 57, 63 n. 4 (2d Cir.2009). In this Circuit, we use the phrase "arguable probable cause" to describe situations in which a police officer is qualifiedly immune from suit for false arrest, even if the arrest is not, with benefit of hindsight, supported by actual probable cause.

Against this backdrop, we turn to the arguments of the parties.

Plaintiff argues that the officers had no probable cause to arrest him for placing a hoax device. Alhovsky acknowledges that there are four elements to the crime for which he was arrested: (1) a device is left in a public place; (2) by its design or construction it looks like it might be a bomb; (3) it is in fact not a bomb, but rather an inoperable facsimile or bomb imitation; and (4) plaintiff knew, intended or reasonably believed that other people would think it was a bomb. He concedes that elements one and two are satisfied in this case (which means he concedes that the balloon pump, by it design or construction, looked like a bomb). And he notes that the police suspected that element four was satisfied as well. He argues that element three—the device left at Starbucks was *in fact* not a bomb, but only something that is an inoperative facsimile or imitation of a bomb—was lacking and was known by the police to be lacking at the time of his arrest. Plaintiff so argues because, " . . . . . the Bomb Squad had rendered the balloon pump inoperable on June 25 by disconnecting it from its battery power source." (Pl. Br. at 17)

This argument is predicated on a misreading of the statute.

The third element of the crime of placing a hoax device is that the device "is, in fact, an inoperative facsimile or imitation of such a bomb . . . . . ." The words "in fact" as used in the statute are a synonym for "actually." In other words, to commit the crime of placing a false bomb, a person needs to plant or leave something in a public place that is not actually a bomb (as plaintiff's balloon pump was not, in fact, a bomb), but that looks like it could be a bomb (it is a facsimile or imitation of a bomb).

That is precisely what the unknown device in the fanny pack was—it was inoperative (that is, it was not designed to blow up anything other than balloons), and it was not "in fact" a bomb (reading "in fact" as "actually"), but it had wires connected to a mechanism and a battery to operate it, so it looked like it could be a bomb. The fact that the Bomb Squad rendered the device entirely inoperative *after* it was found and recovered has nothing to do with the matter. Element three is addressed to the condition the device was in at the time it was placed, not the condition it was in after the Bomb Squad got through examining it.

So at the time of his arrest, the only element that was even arguably in doubt was element four. The police did not know whether Alhovsky knew, intended or reasonably believed that the device he left on the counter at Starbucks would look like a bomb to other people. Alhovsky's state of mind was, at that moment, the only element of the offense that was up in the air. Unless he had the requisite state of mind, the device he left at Starbucks (which was known not to be a real bomb) could not qualify as a "hoax device" within the meaning of the statute.

Since plaintiff's argument makes no sense, we turn to the real issue: whether the police did something wrong by arresting Alhovsky and taking him to the precinct for questioning, rather than asking him questions at the scene and clearing the matter up right there. The answer is no.

First, we must dispose of another red herring. The issue is not whether the

officers erred in stopping Alhovksy in the first place. Defendants argue (mysteriously) that the officers had "probable cause to stop" Alhovsky for riding his bicycle on the sidewalk, in violation of 34 RCNY § 4–07(a)(3)(i), which provides, "No person shall ride or operate a bicycle upon any sidewalk area unless permitted by sign." This makes absolutely no sense for two reasons. First, police officers do not need probable cause to stop a citizen and ask him questions. Second, the police are not permitted to arrest anyone for riding a bike on the sidewalk; it is a civil violation punishable by fine, not a crime, as was erroneously asserted in defendants' moving brief.

But the police did not need to rely on this or any other civil violation to stop Alhovsky and question him. They already had reason to believe that a serious crime might have been committed. The fact that the unknown device left on the Starbucks counter was not a bomb did not undermine the possibility that it was intended to be a hoax device that would precipitate a bomb scare. So the bike patrol officers were well within their rights to stop plaintiff, and to detain him long enough for a detective working the case to arrive and get answers to some perfectly legitimate questions. Furthermore, given the nature of the potential offense—not to mention the fact that Alhovsky had a second suspicious-looking device strapped to his body— the officers were well within their rights to draw their guns and to treat plaintiff as a potentially dangerous person until their concerns could be allayed. At a minimum they had an *arguable* basis for doing so, which entitles them to the shield of qualified immunity.

Plaintiff contends that the officers were not privileged to do anything other than stop him and ask him questions—and perhaps invite him to accompany them to the station house so they could check out his story.

■ Clearly, the law requires officers to conduct an investigative detention in a manner that employs the least intrusive means reasonably available to verify or dispel the officer's suspicion, and to do so in the shortest possible period of time. Police officers may not "seek to verify or dispel their reasonable suspicions of crime 'by means that approach the conditions of arrest'." *Gilles v. Repicky*, 511 F.3d 239, 245 (2d Cir.2007) (quoting *Florida v. Royer*, 460 U.S. 491, 499–500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). And

That settled legal principle does not, however, compel a conclusion that Alhovsky had to be questioned in the street, as plaintiff suggests. Indeed, it would have been almost impossible for on-scene questioning to have occurred. When Detectives Alfonso and Ryan and Sgt. Panuccio arrived on East 66th Street, the situation that confronted them was (at a minimum) volatile. There was another suspicious device, similar to the first, lying on the ground. It needed to be checked out by the Bomb Squad, which was going to necessitate an evacuation of the neighborhood and traffic stoppage. A reasonable police officer could well have concluded that asking plaintiff questions in the middle of the street was inadvisable under the circumstances.

Furthermore, the very fact that when Alhovsky carrying a second suspicious-looking device when he was found altered the probable cause calculation—and not to plaintiff's benefit. As noted above, the only missing element in terms of probable cause was plaintiff's state of mind. Finding him with a second suspicious-looking device strapped around his waist would almost certainly have enhanced, in the mind of a reasonable police officer, the possibility that Alhovsky was a criminal

who was planting hoax devices around Manhattan, rather than someone who was not dangerous, as Goetz had apparently believed.[3]

The court concludes that there was probable cause to arrest Alhovsky, given the totality of the circumstances facing the officers at the scene. This requires the dismissal of the First Claim for Relief insofar as it encompasses a federal constitutional claim for false arrest and the Second Cause of Action for false arrest.

■ If this be incorrect, there was at the very least arguable probable cause for the detectives to arrest plaintiff, so as to cloak the arresting officers and the detectives (who did not immediately undo the arrest when they arrived at the scene) with qualified immunity, thus requiring dismissal of the federal false arrest claim against all of them.[4]

Plaintiff asserts that there is no qualified immunity doctrine under state law, so the common law false arrest claim cannot be dismissed on that basis. Plaintiff is incorrect, although his mistake is a common one.

■■ The doctrine of qualified immunity is generally understood to only protect government officials from federal, not state, causes of action. *Jenkins v. City of New York*, 478 F.3d 76, 86 (2d Cir.2007). However, New York common law fills this gap by providing government officials with a similar form of protection against state law claims. *Id.; see Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir.2006) "New York law ... grant[s] government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis." *Jones*, 465 F.3d at 63 (*citing Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 364 (2d Cir.2004), and *Arteaga v. State*, 72 N.Y.2d 212, 216–17, 532 N.Y.S.2d 57, 527 N.E.2d 1194 (1988)). "To be entitled to qualified immunity, it must be established that it was objectively reasonable for the police officers involved to believe that their conduct was appropriate under the circumstances, or that officers of reasonable competence could disagree as to whether their conduct was proper." *Allen v. City of New York*, 03 Civ. 2829, 2007 WL 24796, at *24 (S.D.N.Y. Jan. 3, 2007) (*quoting Brown v. State*, 12 Misc.3d 633, 648, 814 N.Y.S.2d 492 (N.Y.Ct.Cl.2006)) (other internal citations and quotations omitted). Thus, as is true of federal law, an officer's entitlement to qualified immunity under New York law depends on the reasonableness of his actions. *Jones*, 465 F.3d at 64 (citing cases). The only difference between the federal and state doctrines is that the reasonableness of an officer's action is judged with references to state law and the state, not the federal, constitution. *Allen*, 2007 WL 24796, at *24 (*citing Doyle v. Rondout Valley Cent. Sch. Dist.*, 3 A.D.3d 669, 670–71, 770 N.Y.S.2d 480 (3d Dep't 2004)).

The court is not familiar with any decision of the New York Court of Appeals adopting the "arguable probable cause" doctrine that has recently gained prominence in New York. However, for the reasons already discussed, no reasonable trier of fact could conclude that the arresting officers or the detectives acted in bad faith or without a reasonable basis, under state as well as federal law. Therefore, the

---

3. Goetz might well have changed his mind if he knew that plaintiff had another strange device. What he believed on the basis of less information than was available to the officers who were on duty that night is irrelevant to the probable cause calculation.

4. Goetz, of course, is entitled to dismissal of the false arrest claim because he had no personal involvement in the arrest; he was off duty and there is no evidence that he was consulted about it.

state law claim for false arrest must be dismissed.[5]

Plaintiff also asserts that he was falsely imprisoned because he was not allowed to leave the moment that "Gold Badge" and Ryan saw the balloon pump on the Internet and realized that plaintiff was telling the truth about the device. Plaintiff contends that whatever probable cause may have existed earlier in the evening disappeared as soon as the officers logged onto the Majiloon web site and saw that the devices in plaintiff's possession were commercially available for an innocent purpose.

That contention, too, is rejected, under both federal (First Claim for Relief) and state (Second Claim for Relief) law. While Alhovsky clearly believes that his answer cleared everything up, it was not unreasonable, given the fact that he had multiple devices that looked like bombs (which, as I noted above, he concedes), for the case detectives to continue their investigation. They did so only long enough to assure themselves that plaintiff was not sitting on a cache of items that could be mistaken for bombs if planted in public places. By his own admission, Alhovsky was taken from the precinct to his home at 10 PM, and was released from custody no more than an hour later, when the consensual search of his apartment concluded. (Erlanger Ex. 1 at 131–33).[6] Alfonso saw Alhovsky riding his bike at 6:28 PM, so the entire incident—from plaintiff's unhappy encounter with Gaven, Morenzoni and Paul until he was safely home—lasted, at most, three and one half hours. Plaintiff has no viable claim for false imprisonment.

Defendants' motion for summary judgment dismissing plaintiff's First Claim for Relief, for false arrest and false imprisonment (which he refers to as "deprivation of liberty"), under 42 U.S.C. § 1983 is granted. So is their motion to dismiss the Second Claim for Relief, alleging false arrest and imprisonment under New York common law.

*Plaintiff's Claim for Excessive Force*

Excessive force is part of plaintiff's First Claim for Relief, under Section 1983. There is no corresponding common law claim for assault and battery in the amended complaint.

*As Against Panuccio, Alfonso, Ryan and Goetz*

Panuccio, Alfonso, Ryan and Goetz assert that they cannot be liable for the use of excessive force because they were not at the scene of the arrest. It is undisputed that Panuccio, Alfonso and Ryan were not at the scene until Alhovsky was in handcuffs—after all the force described in plaintiff's deposition had been applied—and it is equally undisputed that Goetz was never at the scene at all, because he was off duty. The officers assert lack of personal involvement in the application of force, which is a prerequisite to liability under 42 U.S.C. § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).

In response, plaintiff cites to wholly inapposite doctrines. He argues, for instance, that these four absent officers can be held liable for the actions of Gaven, Morenzoni and Paul on a theory of supervisory liability. But there is no evidence

---

**5.** The standard for probable cause under federal and state law is exactly the same. If it were concluded that only arguable probable cause existed, this matter might be worth certifying to the New York Court of Appeals for clarification. Taking the literal language of the state qualified immunity doctrine at face value, however, I can see no basis on this

record for any conclusion that the defendants acted in bad faith or without a *reasonable* basis.

**6.** I say "consensual" because, for whatever reason, Alhovsky signed a consent to search form while at the 19th Precinct.

in the record demonstrating that any of these officers was a supervisor of the three officers who were actually involved in subduing plaintiff. Alfonso, Ryan and Goetz were part of the Detective Squad, which is not in the patrol officers' chain of command; Panuccio was a sergeant, but there is no evidence that he had any responsibility for the three officers who happened to get to plaintiff first.

Plaintiff also relies on the doctrine that the knowledge of one officer is presumed to be shared by all officers to construct the following Rube Goldberg argument: Alfonso knew that the fanny pack recovered from Starbucks was not a bomb and that Goetz did not believe that plaintiff was dangerous; therefore, Alfonso should not have advised the officers on the scene to use caution, because doing so is the reason that events spun out of control. But telling officers to use caution is a far cry from suggesting that they use excessive force. Plaintiff's incoherent and convoluted argument is utterly unpersuasive.

Plaintiff really does not have an answer to the argument that the excessive force claim should be dismissed as against the officers who were not personally involved in the application of force or present when it was happening. Their motion is granted.

*As Against Gaven, Morenzoni and Paul*

■ The three officers who were actually on the scene, and who applied whatever force was applied to plaintiff, argue that they did not use excessive force because plaintiff did not suffer any serious injuries. They also argue that they are entitled to qualified immunity because a reasonable officer in their position could have believed it necessary to apply force to subdue plaintiff.

These arguments may eventually prevail, before a jury. But on the facts of this case, viewed most favorably to plaintiff, 1 cannot grant the motion for summary judgment dismissing the excessive force claim against these defendants.

■ The application of force during an arrest is excessive where it is objectively unnecessary in light of the circumstances facing the arresting officers, without regard to their intent or underlying motivation. *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir.2004).

This court does not doubt for one moment that reasonable police officers, seeing a man on a bike, carrying a package that looks suspiciously like a device that they know this very man left at a Starbucks, could reasonably have concluded that the situation was potentially dangerous—whether or not the detective who alerted them to the man's whereabouts told them to "be careful." And since plaintiff by his own admission did not imagine that the officers had any interest in him, he was not necessarily attuned to how it might look to the officers if he just kept riding his bike toward them with a strange device strapped to his waist. Considering all the circumstances, the court can easily conclude that some degree of force was necessary to get Alhovsky to stop. There are disputed issues of fact concerning exactly who did exactly what and when, and these cannot be resolved on motion, since everyone (not surprisingly) tells a different story about how Alhovsky came to a stop and how he was removed from his bike. If that were all the evidence, it would compel a trial.

However, the *coup de grace* is that a disinterested witness—the owner of the small business outside of which the encounter happened—has submitted sworn testimony about seeing a police officer slam plaintiff's head against her store window while an officer holding a gun looked on. She further testified that plaintiff (whom she knew and recognized) was on his knees and in handcuffs when this as-

sault occurred. If this be true, then there was no need for any officer to slam plaintiff's head into a plate glass window in order to subdue him or to effect his arrest. The act of slamming plaintiff's head into the against the glass pan e, without more, constitutes excessive force if it occurred as the disinterested witness said. It is of no moment that plaintiff did not suffer any serious physical injury as a result; it is not objectively reasonable to slam a man's head into a glass window if he is already subdued. *Curry v. Syracuse,* 316 F.3d 324, 332 (2d Cir.2003).

Furthermore, every person's right to be free from the use of more force than is reasonably necessary to effect his lawful arrest is well-settled. No *reasonable* police officer could conclude that it was reasonably necessary to slam a man's head into a plate glass window when the man was on his knees and in handcuffs. Similarly, no reasonable officer who happened to be on the scene could conclude that it was all right for him to stand by and do nothing while a brother officer slammed a defenseless man's head into a plate glass window.

Of course, the trier of fact may not believe the shop owner's story. But that is for a jury to decide—not the court.

Because the record contains numerous issues of disputed fact, at least one of which, if plaintiff's evidence is believed, constitutes excessive force as a matter of law, defendants Gaven, Morenzoni and Paul are not entitled either to dismissal of the excessive force charge or to the shield of qualified immunity, whether under federal or state law. To this extent, their motion for summary judgment is denied.

*Plaintiff's Claim for Intention Infliction of Emotional Distress*

 A claim for intentional infliction of emotional distress is highly disfavored under New York State law. *Howell v. New York Post Co.,* 81 N.Y.2d 115, 121,

596 N.Y.S.2d 350, 612 N.E.2d 699 (1993). Such a claim is viable only when a defendant's conduct was "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Rooney v. Wittich,* 21 F.Supp.2d 273 (S.D.N.Y.1998), quoting *Harville v. Lowville Central School Dist.,* 245 A.D.2d 1106, 667 N.Y.S.2d 175 (A.D. 4th Dept.1997). Furthermore, "no intentional infliction of emotional distress claim will lie where the conduct underlying the claim falls within the ambit of traditional tort liability." *Moore v. City of New York,* 219 F.Supp.2d 335 (E.D.N.Y.2002).

Plaintiff's claim for intentional infliction of emotional distress is barred on every ground. His claims sound in common law torts: false arrest, false imprisonment, assault and battery. And in view of the foregoing discussion, it should be obvious that while some of the conduct alleged by plaintiff is reprehensible, it does not rise to the extraordinary level of depravity required to maintain an IIED claim in New York State.

Defendants' motion for summary judgment dismissing this claim is granted.

*The Claims Relating to the Parks Department*

The City Defendants have also moved for summary judgment dismissing claims asserted by plaintiff against the City that arise out of the rules of the Department of Parks and Recreation. Those claims have been settled, so this aspect of the defendants' motion is dismissed as moot.

*Claims Relating to the City of New York*

 To the extent plaintiff's amended complaint asserts claims against the City of New York based on *Monell,* no evidence has been adduced to support a claim that the excessive force applied by Officers Ga-

ven, Morenzoni and Paul was applied pursuant to a City policy or practice. Therefore, the City's motion is granted to the extent that it seeks dismissal of the surviving claim under Section 1983.

Furthermore, because the false arrest and false imprisonment claims have been dismissed under state as well as federal law, the City cannot be held vicariously liable for either of those torts. The same is true of the claim for intentional infliction of emotional distress.

Finally, since plaintiff did not bring a common law claim that corresponds to his federal excessive force claim, there is no basis to keep the City in this lawsuit as a party defendant. Plaintiff has not asserted that the City is vicariously liable for any common law assault and battery by the officers.

All claims against the City of New York and the Police Department are dismissed.

### Conclusion

For the foregoing reasons, defendants' motion for summary judgment is GRANTED except insofar as it addresses the claim for excessive force asserted against defendants Gaven, Morenzoni and Paul under 42 U.S.C. § 1983. As to that one aspect of the claim, the motion is DENIED.

The parties should amend their pre-trial order to eliminate unnecessary elements within thirty days. The case will be tried on November 16, 2009. The final pre-trial conference will be held October 30, 2009 at 2 PM. In limine motions are due October 2; responses are due October 9. Please familiarize yourselves with my practices at final pre-trial conferences and be prepared to address all issues relating to the admissibility of exhibits at that time.