[841 NYS2d 698]

RICKY BROWN et al., on Behalf of Themselves and All Others Similarly Situated, Appellants, v STATE OF NEW YORK, Respondent. (Claim No. 86979.)

Third Department, August 23, 2007

16

**APPEARANCES OF COUNSEL**

*Whiteman, Osterman & Hanna*, Albany (*Joseph D. Stinson* of counsel), for appellants.

*Andrew M. Cuomo, Attorney General*, Albany (*Denise A. Hartman* of counsel), for respondent.

**OPINION OF THE COURT**

SPAIN, J.

The genesis of this class action litigation is a September 4, 1992 middle of the night home invasion and attack on a 77-year-old woman who was asleep in bed while staying as a guest in a home just outside the City of Oneonta, Otsego County. The victim fought off her assailant and hid for several hours, unsure of his whereabouts, and contacted police around 4:00 A.M. The State Police responded, interviewed the victim and occupants of the house, and oversaw the investigation, which was unsuccessful as the perpetrator and his weapon, a knife, were never found. The victim reported to police (and testified at her 1995 deposition) that she was asleep face down and awoke to find the assailant on top of her, holding a knife in his hand and directing her to turn over; a struggle ensued, during which she knocked the knife out of his hand, he stuffed a cloth into her mouth and then he fell to the floor and eventually fled. She only saw the assailant's left hand, which she described as "black," and told police she was sure he was a "black male" and indicated "his speech was that of a black man." Herbert Chandler, Senior Investigator for the State Police, who coordinated this investigation, testified that the victim also told him that she believed the assailant was "young" based upon his agility and movements during the attack, although apparently the victim never further clarified what she meant by "young."[1] At the scene, Chandler found a trail of blood running from the victim's bedroom, down the hall and out a sliding glass door and into the grass. Chandler and his colleagues concluded from the amount and location of the blood that the assailant had cut his hand or arm.

Based on the foregoing description by the victim and examination of the crime scene, a comprehensive investigation was

1. The victim's characterization of the perpetrator as "young" did not appear in her written statement to police, in the police teletypes broadcast during the investigation or in her deposition, and first officially appeared in Chandler's investigative report months after the attack. However, nearly all of the State Police officers and other members of law enforcement testified that Chandler communicated this aspect of the victim's description to them in the very early stages of the investigation. Thus, we are unpersuaded by claimants' contentions that the factfinder should not have credited Chandler's account in this regard. Also, the proof and testimony at trial overwhelmingly demonstrate that, with few exceptions, the investigation—from the beginning—focused predominantly on young black males with possible hand/arm injuries and others who might possess relevant knowledge.

immediately commenced seeking to identify young black males in the area with cuts to their hands or arms. Chandler solicited assistance from the City of Oneonta Police Department, the Otsego County Sheriff's Department and the campus Public Safety Office at SUNY Oneonta (hereinafter SUCO) located about one-half mile from the crime scene, where the victim had attended a lecture the night before. As part of the investigation, members of law enforcement pursued a vast number of leads, including contacting hospitals, medical providers, convenience stores and pharmacies to inquire if someone matching the description had sought medical treatment or supplies, interviewing neighbors and surveyors working in the area, contacting taxi companies, dispatching officers to the city bus station to interview those leaving town for the imminent Labor Day weekend and to see if anyone matching the description had hand/arm injuries, interviewing persons at the local Job Corps Center where reportedly a large group of trainees matching the description resided, checking arrest and parole records, conducting interviews at a nearby apartment complex and contacting local colleges and area sports teams who jogged in the area.

At the request of the State Police, SUCO administrators generated a list of all black male students attending SUCO with their campus or off-campus addresses. Chandler testified that lead sheets were generated and assigned from that list, and he dispatched the investigating officers from the State Police, County Sheriff's deputies, and city police to conduct visits and interviews. He instructed the officers not to go to the rooms of the students on the list but, rather, to meet with dormitory supervisors who would contact the students and request that they come to an office for an interview. The testimony at trial establishes that the teams of officers investigating those leads late on the afternoon of September 4, 1992 in fact went door-to-door on campus with SUCO security personnel in their effort to interview students on the list, and made similar attempts to interview students who lived off campus. Police also approached persons on and off campus, explained the crime and requested a show of hands/arms to check for injuries. On September 9, 1992, after a janitor found a bloody towel outside a SUCO dorm, all students living in the five nearby dormitories were questioned.

In 1993, claimants, black persons who resided or were present in Oneonta at the time, commenced parallel actions in state and federal court alleging that the conduct of law enforcement during the police investigation in which they were approached,

questioned, searched and/or seized, and required to submit to an examination of their hands and arms, violated, among other rights, their statutory and constitutional right to equal protection and to be free from unreasonable searches and seizures. In 1996, the Court of Appeals recognized claimants' rights to assert, in the Court of Claims, causes of action against defendant for damages resulting from alleged constitutional torts, specifically, racially motivated violations of the Search and Seizure (claim 7) (*see* NY Const, art I, § 12) and Equal Protection (claim 8) (*see* NY Const, art I, § 11) Clauses of the NY Constitution, and for negligent training and supervision (claim 11) (*Brown v State of New York*, 89 NY2d 172 [1996]). Sixty-seven claimants were granted class action status in the Court of Claims as to those three remaining causes of action, on the issue of liability (*Brown v State of New York*, 250 AD2d 314, 317 [1998]).

In 2000, the US Court of Appeals for the Second Circuit resolved the federal action by dismissing all federal equal protection claims, finding that the plaintiffs therein had "not identified any law or policy that contains an express racial classification" inasmuch as:

> "they were not questioned solely on the basis of their race. They were questioned on the altogether legitimate basis of a physical description given by the victim of a crime. Defendants' policy was race-neutral on its face; their policy was to investigate crimes by interviewing the victim, getting a description of the assailant, and seeking out persons who matched that description. This description contained not only race, but also gender and age, as well as the possibility of a cut on the hand. In acting on the description provided by the victim of the assault—a description that included race as one of several elements—defendants did not engage in a suspect racial classification that would draw strict scrutiny" (*Brown v City of Oneonta, N.Y.*, 221 F3d 329, 337-338 [2d Cir 2000], *reh and reh en banc denied* 235 F3d 769 [2000], *cert denied* 534 US 816 [2001]).

With regard to the plaintiffs' 4th Amendment search and seizure constitutional tort claim, the Second Circuit concluded that four of them (Jamel Champen, Jean Cantave, Ricky Brown and Sheryl Champen) had been seized during their encounter with police and reinstated their claims, finding that they were

entitled to pursue claims for damages against the remaining defendants (*id.* at 340-342).[2]

Claimants thereafter proceeded to trial in the Court of Claims in late 2005 on the remaining three claims. Only three claimants testified at trial (Brown, Sheryl Champen and Hopeton Gordon), and the deposition testimony of Jean Cantave, who was unavailable for medical reasons, was read into the record without objection. The victim died prior to trial; her deposition testimony was read into the record.

After a nonjury trial, the Court of Claims issued a lengthy written decision, commendable in its thoroughness, dismissing all equal protection claims except the individual claim of Sheryl Champen; her claim was severed at the conclusion of the trial and a finding of liability was made in her favor on both the equal protection and search and seizure constitutional tort claims (12 Misc 3d 633 [2006]). The court also concluded that Brown had been unlawfully seized while walking on campus when approached by three officers "who created a barrier to his movement," establishing his individual claim for violation of his constitutional rights under the Search and Seizure Clause (*id.* at 644).[3] The court further found that Cantave had also been unlawfully seized when stopped by Oneonta police while driving his vehicle on a city street, but held that defendant was not liable for the actions of city officers which had not been directed by the State Police as part of this investigation, where the officers were not acting as special employees of defendant. With regard to Gordon, the court concluded that the "brief" encounter in his dormitory room did not amount to a seizure (*id.* at 643). All remaining individual and class-based claims for constitutional tort were dismissed, as was the claim for negligent training and supervision.

We cannot agree with claimants' primary contention on appeal that the Court of Claims erred in dismissing all of the equal protection-based constitutional tort claims, except Champen's, at the conclusion of this trial. In reviewing the court's

---

**2.** Subsequently, this Court declined to give collateral estoppel effect to the Second Circuit's ruling on federal law, so as not to preclude the class of claimants from pursuing their state constitutional claims in state court (*Brown v State of New York*, 9 AD3d 23, 26 [2004]). We did, however, grant defendant's request to amend its answer to clarify its denials regarding the equal protection claims, i.e., whether claimants were stopped on the basis of race alone (*id.* at 28-29).

**3.** After a trial on damages, Champen was awarded $35,000, and Brown was awarded $5,000, which was offset by his recovery in the federal action.

verdict following a nonjury trial, "we independently review the weight of the evidence and may grant the judgment warranted by the record, while according due deference to the trial judge's factual findings particularly where . . . they rest largely upon credibility assessments" (*Martin v Fitzpatrick*, 19 AD3d 954, 957 [2005]; *see Salvador v Uncle Sam Auctions & Realty, Inc.*, 30 AD3d 861, 861 [2006]). We are also guided by the principles that the governing standard of proof which claimants must satisfy to prevail on their claims is itself a reviewable question of law, and that "New York courts addressing a state equal protection claim will ordinarily afford the same breadth of coverage conferred by federal courts under the US Constitution in the same or similar matters" (*Brown v State of New York*, 9 AD3d 23, 27 [2004]; *see Hernandez v Robles*, 7 NY3d 338, 361-362 [2006]; *Brown v State of New York*, 89 NY2d 172, 190 [1996], *supra*; *Under 21, Catholic Home Bur. for Dependent Children v City of New York*, 65 NY2d 344, 360 n 6 [1985]).

Claimants maintain that defendant violated their equal protection rights by creating an express racial classification and pursuing an investigation in which all black males in the city were sought for questioning regarding this crime. They argue that police approached, attempted to stop and question, and physically inspected the hands and arms of non-white males because of their race, and that such conduct was racially motivated. While claimants are correct that racial classifications imposed by defendant must be analyzed under the strict scrutiny test in which a compelling government interest must be demonstrated (*see Grutter v Bollinger*, 539 US 306, 326-327 [2003]; *see also Johnson v California*, 543 US 499, 505 [2005]), the testimony and documentary evidence adduced at trial failed to demonstrate that the State Police in their investigation ever adopted a policy (or followed a law) which "expressly classifie[d] persons on the basis of race" so as to constitute the type of express racial classification triggering strict scrutiny (*Hayden v County of Nassau*, 180 F3d 42, 48 [2d Cir 1999]; *see Adarand Constructors, Inc. v Pena*, 515 US 200, 213 [1995]; *cf. Monroe v City of Charlottesville, Va.*, 471 F Supp 2d 657, 662 [WD Va 2007]).

█ Upon review of the record, we agree with the factfinder's conclusion that, "[a]lthough black males in Oneonta were widely sought for questioning, the proof does not establish an express racial classification as to the members of the class" (12 Misc 3d 633, 647 [2006], *supra*). In this regard, we are in agreement

with the Second Circuit that, in pursuing this investigation, the State Police did not engage in racial stereotyping or profiling of violent criminals to hypothesize or presume that the assailant was black, young and male (*see Brown v City of Oneonta, N.Y.*, 221 F3d 329, 337 [2000], *supra*). Thus, the erroneous supposition underlying claimants' equal protection argument—which is fatal—is that they were questioned solely because of their race. As the Second Circuit aptly concluded, "they were not questioned solely on the basis of their race. They were questioned on the altogether legitimate basis of a *physical description given by the victim* of a crime . . . [which] contained not only race, but also gender and age, as well as the possibility of a cut on the hand" (*id.* at 337 [emphasis added]; *see United States v Waldon*, 206 F3d 597, 604 [6th Cir 2000], *cert denied* 531 US 881 [2000]; *United States v Davis*, 200 F3d 1053, 1054-1055 [7th Cir 2000]; *United States v Lopez-Martinez*, 25 F3d 1481, 1487 [10th Cir 1994]; *Monroe v City of Charlottesville, Va.*, *supra* at 663; *see also Von Herbert v City of St. Clair Shores*, 61 Fed Appx 133, 148-149 [6th Cir 2003]).

Claimants in turn argue that reliance by the State Police on race as the sole or a predominant identifying feature—even though part of a description provided by a victim/witness and not originating with defendant—constitutes an express racial classification subject to strict scrutiny. No clear authority for this proposition is provided,[4] and we are unpersuaded. First, we cannot conclude that use of a description provided by a victim/witness containing (or consisting of) a racial descriptor constitutes " 'governmental action based on race' " within the intendment of the Equal Protection Clause (*Grutter v Bollinger*, *supra* at 326, quoting *Adarand Constructors, Inc. v Pena*, *supra* at 227). This would blur the critical distinction between a policy or law imposing or adopting an express racial classification which would be subject to heightened scrutiny, and the legitimate, race-neutral policy employed here of pursuing those who matched the description provided by the victim which included race, age, gender and possible injuries. In the latter instance, police are not required to ignore or minimize the race component of a description in order to avoid equal protection violations. While the police investigation surely encompassed individuals

---

4. While numerous similar novel equal protection theories have been offered (*see e.g. Brown v City of Oneonta, N.Y.*, 235 F3d 769 [2000] [denial of rehearing and rehearing en banc, concurring and dissenting opinions], *cert denied* 534 US 816 [2001]), none has gained acceptance.

not meeting all of the identifying descriptors, as possible suspects as well as persons with potential helpful information, the proof did not support claimants' allegation that, overall, police relied solely on race or that they routinely abandoned all nonracial aspects of the victim's description in their pursuit (*cf. United States v Frazier*, 408 F3d 1102, 1108 [8th Cir 2005], *cert denied* 546 US 1151 [2006]; *United States v Avery*, 137 F3d 343, 354-355 [6th Cir 1997]).

The only exception was the questioning of 31-year-old Champen, the sole female claimant, who was required to present identification and show her wrists in order to board the New York City bound bus, which the Court of Claims concluded was based solely on race, "[t]he only physical characteristic that clearly connected her to the description of the assailant" (12 Misc 3d 633, 647 [2006], *supra*). We agree that this violation of Champen's rights, while racially motivated, was not sufficient to demonstrate either an express racial classification or discriminatory animus in the overall investigation so as to hold defendant liable to the class as a whole under its equal protection claim (*id.* at 647-648). Thus, Champen's claim was properly severed and the remaining constitutional tort claims premised on equal protection violations were properly dismissed.

Claimants also asserted a separate constitutional tort claim based upon alleged violations of their state protections against unreasonable searches and seizures. After this trial, defendant was held liable for the seizure of Champen (bus station stop) and Brown (street stop), not liable for the city police's seizure of Cantave (vehicle stop), and the remaining search and seizure tort claims were dismissed. On appeal, claimants make few legal arguments directed at the particular circumstances of each of their police encounters (or the factfinder's conclusions); instead—as at trial—they rely on the testimony of the testifying claimants and the law enforcement officers to support the search and seizure claims of the class as a whole, which—we agree—was unsuccessful. Also, claimants' arguments pertaining to their search and seizure claims are raised only in the context of their equal protection arguments, and they appear to have abandoned most issues related to their search and seizure claims by failing to raise them in their brief on appeal, although their intent is unclear (*see Pizarro v State of New York*, 19 AD3d 891, 892 [2005], *lv denied* 5 NY3d 717 [2005]).

As noted, claimants' right to pursue a state constitutional tort claim for damages against defendant for violations of their

right to be free of unreasonable searches and seizures has been established (*see Brown v State of New York*, 89 NY2d 172, 191-192 [1996], *supra*). Indeed, none was ever arrested or charged (or even considered to be a suspect) in this crime and a tort action is their only remedy for harm caused by constitutional violations, if proven (*see id.* at 192-196; *see also Martinez v City of Schenectady*, 97 NY2d 78, 83-84 [2001]). In analyzing this class action claim, the Court of Claims employed the four-prong *De Bour* test governing police encounters to determine whether an impermissible seizure had occurred, i.e., a level 3 (forcible stop and detention requiring reasonable suspicion) or level 4 (arrest based on probable cause), so as to support a constitutional tort based upon a violation of the Search and Seizure Clause[5] (*see People v De Bour*, 40 NY2d 210, 223 [1976]; *see also People v Hollman*, 79 NY2d 181 [1992]). Here, it was undisputed that the police did not have reasonable suspicion to believe that any of the claimants (or anyone else) was involved in this crime; thus, the only issue was whether claimants proved that all members of the class at trial (or any individual claimants) had been seized, i.e., forcibly stopped and detained (level 3).[6] Notably, however, the level of the encounter—including whether a tortious seizure occurred—and whether circumstances existed to justify it are fact-specific inquiries ordinarily decided on a case-by-case basis rather than as to a diverse group whose disparate encounters at different locations and places occurred under varying circumstances (*see People v Bora*, 83 NY2d 531, 535-536 [1994]; *People v De Bour, supra* at 216; *see also People v Ocasio*, 85 NY2d 982, 984 [1995]).

Upon our review of the record, we find that neither the testimony of the law enforcement officers investigating this crime—and the related documentary evidence—nor the testimony of the class members established that each and every member of the class experienced a significant interruption of his or her freedom of movement so as to amount to an action-

---

**5.** We recognize, of course, that *People v De Bour* (40 NY2d 210 [1976]) and its progeny represent a common-law framework for evaluating police-citizen encounters for purposes of suppression motions in criminal prosecutions. When read in conjunction with *Brown v State of New York* (89 NY2d 172, 191 [1996], *supra*) and its progeny recognizing a right to seek damages for constitutional torts based upon search and seizure violations, we are convinced that the tort so recognized contemplates at least a level 3 or higher *De Bour* encounter. Thus, the contentions on appeal that Gordon's level 2 encounter established a constitutional search and seizure tort are rejected.

**6.** There was no proof that anyone was arrested so as to constitute a level 4 *De Bour* encounter.

able seizure (*see People v Bora, supra* at 535-536; *Landsman v Village of Hancock*, 296 AD2d 728, 733 [2002], *appeal dismissed* 99 NY2d 529 [2002]). To the contrary, the evidence demonstrates that the vast majority of police encounters did not go beyond brief level 2 common-law inquiries, involving requests for name, identification, destination and possible information about the crime, and a request to show hands and arms (*see People v Hollman, supra* at 184, 191-192). While three individual claimants[7] were found to have been seized (Brown, Sheryl Champen and Cantave), their encounters occurred under materially different circumstances: a street encounter (Brown), a bus-boarding encounter (Champen) and a traffic stop (Cantave); their disparate experiences in which their rights were violated provide no basis for relief to the class as a whole, and the remaining tort claims were properly dismissed.

■ We are not persuaded by claimants' contention that the Court of Claims abused its sound discretion in declining to permit into evidence the Roth Report, which they sought to introduce solely for purposes of impeaching the credibility of Chandler, i.e., to support their claim that Chandler fabricated in his investigative report—prepared months after the investigation began—that the victim had described the perpetrator as "young" in addition to being a black male, in response to public criticism of this investigation. According to the offer of proof made at trial, the Roth Report, published in 1997, is a government investigative report that was produced following an extensive investigation ordered by the Governor into the activities of State Police Troop C over a four-year period up until 1992, addressing allegations of evidence tampering and manufacturing. While the report apparently raised concerns regarding Chandler's activities in other criminal investigations, the evidence thereof was inconclusive, and there was no finding of wrongdoing related to *this case* or other cases. The Court of Claims considered the civil context of this case, including claimants' ability to otherwise impeach Chandler on cross-examination, and declined to admit this report under the public document exception to the hearsay rule (*see* CPLR 4520), noting that it was a wide-ranging report covering an extended period of time whose admission would result in a "trial within a trial"

7. Brown and Champen prevailed individually on their search and seizure claim and defendant has not appealed. Cantave was determined to have been seized and the finding of no state liability for Cantave's seizure, individually, is discussed infra.

concerning the validity of its findings, which did not concern technical matters and the relevancy of which was limited to Chandler's credibility. Even if the report were deemed to be trustworthy and reliable, given its lack of findings related to this investigation and the unrefuted testimony that Chandler communicated the age descriptor to law enforcement at the outset of the investigation, we discern no abuse of discretion in the court's considered determination that it was not sufficiently material and relevant to warrant derailing the focus of this trial (*see Cramer v Kuhns*, 213 AD2d 131, 136-137 [1995], *lv dismissed* 87 NY2d 860 [1995]; *cf. Beech Aircraft Corp. v Rainey*, 488 US 153 [1988]; *Kozlowski v City of Amsterdam*, 111 AD2d 476 [1985]).

■ Finally, we find no error in the dismissal of claimants' negligent training and supervision claim. As they conceded at the close of proof, claimants offered no evidence of negligent training at trial. Moreover, "a claim for negligent training in investigative procedures is akin to a claim for negligent investigation or prosecution, which is not actionable in New York" (*Russ v State Empls. Fed. Credit Union [SEFCU]*, 298 AD2d 791, 793 [2002]). Claimants' sole argument on appeal on their remaining negligent supervision claim appears to be in actuality that defendant should have been held *vicariously liable* for the State Police's negligent supervision of *all* officers involved in this investigation—particularly the city officers who stopped Cantave[8] a theory not raised in their eleventh claim for negligent supervision.

In any event, no expert or other testimony was adduced at trial to support the negligent supervision claim. Indeed, properly viewed, claimants' arguments are directed not at proof that the non-state officers were *negligently supervised* by the State Police in any manner but, rather, on arguing that defendant should be liable for the conduct of all non-state officers related to this investigation under principles of respondeat superior. Notably, since the officers were all acting within the scope of their employment, as the Court of Claims correctly held, defendant could only be liable for the non-state officers, if at all, under principles of respondeat superior—and not for negligent supervision (*see Judith M. v Sisters of Charity Hosp.*, 93 NY2d 932, 933 [1999]; *Ashley v City of New York*, 7 AD3d 742, 743 [2004]; *Rossetti v Board of Educ. of Schalmont Cent. School Dist.*, 277 AD2d

---

8. Cantave prevailed on his search and seizure claim against the city in federal court.

668, 670 [2000]; *see also Coville v Ryder Truck Rental, Inc.*, 30 AD3d 744, 745 [2006]; *Watson v Strack*, 5 AD3d 1067, 1068 [2004]). Defendant is not vicariously liable for the actions of all non-state officers involved in this investigation, however, because they are not state employees and did not engage in state action. We, like the factfinder, find that the proof does not support the conclusion that the non-state investigators could be deemed "special employees" of defendant for purposes of this investigation (*see Thompson v Grumman Aerospace Corp.*, 78 NY2d 553, 557 [1991]; *Ribeiro v Dynamic Painting Corp.*, 23 AD3d 795, 795-796 [2005], *lv denied* 6 NY3d 707 [2006]; *Walls v Sano-Rubin Constr. Co.*, 4 AD3d 599, 601 [2004]).

The testimony in that regard did not establish that—as part of this investigation—Chandler or any state actor directed, authorized or approved of any traffic stops of persons meeting the victim's description of the perpetrator. Further, the proof did not demonstrate that Chandler controlled or directed the manner, details or ultimate result of all law enforcement efforts to find the assailant, or that defendant provided equipment, or had any right to discipline/discharge/compensate the independent, non-state law enforcement officers assisting in this investigation so as to render them all special employees of defendant (*see Thompson v Grumman Aerospace Corp., supra* at 557; *Perkins v Dryden Ambulance, Inc.*, 31 AD3d 859, 860 [2006]; *Ribeiro v Dynamic Painting Corp., supra* at 796; *Walls v Sano-Rubin Constr. Co., supra* at 601). Moreover, even if it were determined that the officers acted outside the scope of their employment (precluding vicarious liability under respondeat superior), a negligent supervision claim requires proof that defendant, as employer, "knew or should have known of the employee's propensity for the conduct which caused the injury" (*State Farm Ins. Co. v Central Parking Sys., Inc.*, 18 AD3d 859, 860 [2005]; *see Ernest L. v Charlton School*, 30 AD3d 649, 650 [2006]; *Travis v United Health Servs. Hosps., Inc.*, 23 AD3d 884, 884-885 [2005]; *see also Judith M. v Sisters of Charity Hosp., supra* at 933-934), and the record is devoid of any such proof.

Claimants' remaining contentions are unavailing.

CREW III, J.P., MUGGLIN, LAHTINEN and KANE, JJ., concur.

Ordered that the judgment is affirmed, without costs.