PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LARRY MONROE, on behalf of
himself and all others similarly
situated,

*Plaintiff-Appellant,*

v.

THE CITY OF CHARLOTTESVILLE,
VIRGINIA; TIMOTHY J. LONGO, SR.,
In his official capacity; JAMES
MOONEY, Police Officer in his
official capacity,

*Defendants-Appellees.*

No. 08-1334

Appeal from the United States District Court
for the Western District of Virginia, at Charlottesville.
Norman K. Moon, District Judge.
(3:05-cv-00074-NKM-JGW)

Argued: May 12, 2009

Decided: August 31, 2009

Before SHEDD, Circuit Judge, C. Arlen BEAM,
Senior Circuit Judge of the United States Court of Appeals
for the Eighth Circuit, sitting by designation,
and Joseph F. ANDERSON, Jr., United States District
Judge for the District of South Carolina,
sitting by designation.

Affirmed by published opinion. Senior Judge Beam wrote the opinion, in which Judge Shedd and Judge Anderson joined.

---

**COUNSEL**

**ARGUED:** Neal Lawrence Walters, SCOTT KRONER, PLC, Charlottesville, Virginia, for Appellant. Alvaro A. Inigo, ZUNKA, MILNOR, CARTER & INIGO, LTD., Charlottesville, Virginia, for Appellees. **ON BRIEF:** Deborah C. Wyatt, WYATT & ASSOCIATES, Charlottesville, Virginia, for Appellant. Richard H. Milnor, ZUNKA, MILNOR, CARTER & INIGO, LTD., Charlottesville, Virginia, for Appellees.

---

**OPINION**

BEAM, Senior Circuit Judge:

Larry Monroe appeals the district court's dismissal of his § 1983 action, alleging the court erred in (1) denying his motion for class action certification, (2) dismissing his Fourth Amendment claim for failure to plead facts sufficient to show a seizure, and (3) finding no equal protection violation because a racial classification had not occurred. We affirm.

I.

In the spring of 2002, Charlottesville Police began investigating a serial rapist who was consistently described by victims as a youthful-looking black male. At least three composite images were formed based on descriptions given by victims over the course of the investigation. In addition to the descriptions, however, officers also had samples of the assailant's DNA. In an effort to apprehend the attacker, officers approached individuals in the community who matched the general description and who did not have a DNA sample

on file with police, and asked those individuals if they would submit a DNA specimen. Those approached varied somewhat in height, build, and skin tone, but all were African-American. The individuals came to the attention of officers through various means, but in total, 190 youthful-looking black males were stopped over several years, including Monroe, who was approached at his home by Officer Mooney. Other individuals were stopped on the street by officers and asked to submit a DNA sample.[1]

Monroe sued the City of Charlottesville and individual officers, including Officer Mooney (collectively, "the City"), under § 1983 alleging violations of the Fourth and Fourteenth Amendments. Specifically, Monroe alleged an equal protection violation on the grounds that he was stopped because he was black, and because officers do not perform such "dragnet" stops of individuals when the victim describes an assailant as white. In addition, Monroe alleged he was subject to an unreasonable seizure when Officer Mooney came to Monroe's home and when Monroe gave bodily fluids for DNA analysis. Monroe sought to pursue his equal protection claim as a class action.

The district court, on the City's Rule 12(b)(6) motion,[2] dis-

---

[1]With perhaps minimal exceptions, only persons reasonably matching a developed composite image, and those who came to light via a Crimestoppers tip or who turned up in a search of police records, most often after having been arrested on a sexual misconduct charge, were among the 190 individuals ultimately contacted. State Court Trial Transcript at 151-52, *Monroe v. City of Charlottesville*, No. 3:05-cv-00074 (W.D. Va.) (exhibit to motion for partial summary judgment filed Mar. 22, 2006).

[2]While ostensibly considered on a Rule 12(b)(6) motion, a substantial number of uncontested material facts from outside of the pleadings concerning the equal protection claim were presented to and considered by the district court. This information came from a transcript of the evidence from a state trial proceeding instituted by Mr. Monroe against Officer Mooney, one of the defendants here. "While it may [have been] preferable for [the] district court to trigger" a conversion of the Rule 12(b)(6) motion to one under Rule 56, a conversion, sua sponte, by an appellate court, as necessary, is generally permitted. *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

missed that portion of Monroe's equal protection claim that alleged a violation on the grounds that Monroe was approached because he was black. Citing *Brown v. City of Oneonta*, 221 F.3d 329 (2d Cir. 2000), the district court held that the government does not expressly classify a person based on race, and the Equal Protection Clause is not implicated, when officers limit their investigation to only those persons matching a victim's description of an assailant. Monroe could proceed, however, on the claim that the City does not investigate crimes the same way when the assailant is described as white. The district court also dismissed Monroe's claim that he was unreasonably seized when Officer Mooney came to Monroe's home because Monroe failed to state facts sufficient to show the consensual encounter escalated to a seizure. Monroe was granted leave to amend his complaint, however, and his claim that his bodily fluids were unreasonably seized was allowed to proceed.

Monroe's amended complaint alleged the same claims as the first complaint, but with more factual allegations. Specifically, regarding Monroe's Fourth Amendment claim, he asserted a seizure on account of Officer Mooney coming to Monroe's home in uniform, asking for a DNA sample, and failing to tell Monroe he could decline the request. In addition, because the encounter was at Monroe's home, and based on "[t]he state of relations between law enforcement and members of minority communities," he alleged that it was objectively reasonable to feel he was not free to terminate the interaction.

The City again moved to dismiss for failure to state a claim. And, the district judge again dismissed that part of Monroe's equal protection claim alleging a violation because officers only approached him because he was black, but allowed the remaining portion to proceed. Also, the district judge again dismissed Monroe's claim that he was unreasonably seized, stating that the newly alleged facts did not cure the original deficiencies. Monroe's remaining unreasonable seizure

claim—his giving Officer Mooney bodily fluids for DNA analysis—was permitted to proceed. The district court then set the date for a class certification hearing and established July 13, 2007, as the deadline for the parties to file memoranda on that issue.

Along with its motion in opposition to class certification, the City submitted an affidavit from Officer Sclafani reciting a conversation he had with Monroe where Monroe made several statements undermining his fitness to serve as a class representative, including: Monroe's attorneys would not return his calls, the attorneys originally approached him about filing suit, he only learned the suit was filed in his name after reading about it in the paper, the lawsuit made him look bad, and he was not interested in pursuing money damages against Officer Mooney. Monroe did not file a response by the deadline and the class certification hearing was held on July 20, 2007. At the hearing, the central issue was Monroe's adequacy to represent the class. Monroe, however, did not attend the hearing and did not submit an affidavit in response to Officer Sclafani's. Rather, Monroe's attorney testified that she always returns calls and that Monroe originally approached her about filing suit. In addition, Monroe's attorney submitted Monroe's deposition testimony as evidence of his adequacy to serve as a class representative. At the end of the hearing, the district judge asked, "Any other evidence to come in?" Monroe's attorney responded, "No further evidence, Your Honor." Yet, on July 23, 2007, Monroe filed an affidavit refuting Officer Sclafani's affidavit, and the City opposed the submission as untimely.

In its order, the district judge declined to consider Monroe's untimely affidavit, and denied Monroe's motion for class certification because Monroe failed to show that he would adequately represent the class. The court relied in large part upon Officer Sclafani's affidavit. The district court also relied on the fact that in Monroe's deposition, Monroe could not recognize the complaint and had little to no knowledge

about the lawsuit. Monroe was allowed to proceed on his individual claims of (1) an equal protection violation based on the City's alleged failure to institute similar investigation methods when the assailant is described as white, and (2) the unreasonable seizure of his bodily fluids. Rather than proceed, however, Monroe filed a voluntary motion to dismiss his remaining claims without prejudice. To secure the City's consent to Monroe's motion and establish appellate jurisdiction, the parties agreed that Monroe would be precluded from filing suit on those claims in the future—rendering the dismissal one with prejudice. The district court then dismissed Monroe's remaining claims.

Monroe now appeals the denial of class certification, the dismissal of his Fourth Amendment claim, and the dismissal of his equal protection claim.

## II.

### A.    Class Certification

The district court's denial of class certification is reviewed for an abuse of discretion, and such decisions are "generally accorded great deference." *Simmons v. Poe*, 47 F.3d 1370, 1380 (4th Cir. 1995). Rule 23(a) of the Federal Rules of Civil Procedure establishes four class certification requirements: (1) a class so numerous that joinder of all members is impracticable; (2) questions of law or fact common to the class; (3) a representative party whose claims and defenses are typical of the class's claims and defenses; and (4) a representative party that will fairly and adequately protect the class's interests. *Id.* A plaintiff bears the burden of proving these requirements. *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006).

The district court denied Monroe's class certification on the grounds outlined in Rule 23(a)(4)—that Monroe would not fairly and adequately represent the interests of the class. Mon-

roe alleges two errors. First, Monroe alleges the district court erred in denying admission of his affidavit as untimely when no timing for the admission of evidence was discussed and the affidavit countered Officer Sclafani's affidavit. Second, Monroe claims that even if his affidavit is not considered, Rule 23(a)(4) was satisfied because he was not simply lending his name to a suit controlled entirely by the class attorney as the district court seemed to find.

The district court did not abuse its discretion in refusing to consider Monroe's untimely affidavit. When deciding a motion for class certification, a district court does not accept the plaintiff's allegations in the complaint as true; rather, an evidentiary hearing is typically held on the certification issue. *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 365-67 (4th Cir. 2004); *see also* 5 *James W. Moore et al., Moore's Federal Practice* § 23.82(2) (3d ed. 1998). Further, this court defers to the right of a district court to set and enforce pre-trial filing deadlines. In this case, the district court set July 13, 2007, as the deadline for submitting memoranda on the issue of class certification, and Monroe concluded the July 20, 2007, class certification hearing by stating that he had no further evidence to submit on the issue. Thus, the district court acted within its sound discretion by striking Monroe's untimely affidavit submitted on July 23, 2007.[3]

Turning to the court's application of Rule 23(a)(4), the district court did not abuse its discretion in denying class certification on the evidence presented. To satisfy Rule 23(a)(4), a class representative must, among other factors, be of a charac-

---

[3]Even if Monroe's affidavit had been considered, it adds nothing to the record that would alter the district court's decision. Monroe's proffered affidavit only addresses the contention that the class attorneys were not responsive by stating that Monroe merely said he "had not heard anything in awhile"—a tenuous distinction at best. And, while Monroe also stated in the affidavit that he wanted to proceed with the lawsuit, Officer Sclafani said nothing about whether Monroe wanted to continue the lawsuit, and the district did not rely on any such statement.

ter to vigorously pursue the case. 7A *Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure* § 1766 (3d ed. 2005) (collecting cases). Findings that a representative lacks sufficient interest, credibility, or either knowledge or an understanding of the case—although a knowledge or understanding of all the intricacies of the litigation is not required—are grounds for denying class certification. *Id.* The analysis is intended "to ensure that the parties are not simply lending their names to a suit controlled entirely by the class attorney." *Id.*

With these principles in mind, the district court made findings showing that Monroe had little interest in or knowledge and understanding of the case, and appeared to be merely lending his name to the suit. The City offered evidence showing Monroe (1) was unaware of the suit and only learned the suit was filed in his name after reading about the lawsuit in the newspaper; (2) said the class attorneys would not return his calls; and (3) believed the lawsuit made him look bad. The only rebuttal evidence Monroe offered was his attorney's testimony that she "always returns calls" and that Monroe approached her about the suit. Further, at Monroe's deposition, he could not recognize the complaint and said he knew nothing about when the lawsuit was filed. Curiously, all inquiries made into when Monroe first considered or authorized filing suit, and whether he was aware of the suit prior to it actually being filed, were objected to on the basis of attorney-client privilege. Because Monroe bears the burden of showing that Rule 23(a)(4) is satisfied, and Monroe offered virtually no evidence refuting glaring questions as to his adequacy as a class representative, and because the district court is accorded great deference in deciding class certification issues, there was no abuse of discretion.

## B.    Fourth Amendment Claim

The district court dismissed Monroe's Fourth Amendment claim under Rule 12(b)(6). Monroe alleges the district court

required him to plead facts sufficient to *prove* his claim, instead of merely requiring "enough facts from which the trial court could *infer* a basis for [Monroe's] claim" when viewed in conjunction with potentially discoverable facts, as Rule 12(b)(6) requires. An order granting dismissal under Rule 12(b)(6) is reviewed de novo taking "the factual allegations in the complaint as true." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 764 (4th Cir. 2003). However, the court "need not accept the legal conclusions drawn from the facts, and [ ] need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006).

On a Rule 12(b)(6) motion, a "complaint must be dismissed if it does not allege 'enough facts to state a claim to relief that is plausible on its face.'" *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In *Twombly*, The Supreme Court upheld a Rule 12(b)(6) dismissal because the complaint did not allege sufficient facts showing a claim was plausible rather than merely conceivable. 550 U.S. at 570. Thus, "[i]n reviewing a motion to dismiss an action pursuant to Rule 12(b)(6) . . . [a court] must determine whether it is plausible that the factual allegations in the complaint are 'enough to raise a right to relief above the speculative level.'" *Andrew v. Clark*, 561 F.3d 261, 266 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555).

To establish a Fourth Amendment claim, Monroe must show he was (1) unreasonably (2) seized (3) by a government actor. *See Henry v. Purnell*, 501 F.3d 374, 380, 382 (4th Cir. 2007). The district court dismissed Monroe's claim because he failed to sufficiently plead facts showing he was seized. Monroe's complaint, which must be taken as true, alleges the following to establish seizure:

1. He "was visited in his home and coerced into giving a DNA sample;"

2.  The encounter was not consensual because "Monroe had both an objectively and subjectively reasonable belief that he was not free to decline the officer's request or otherwise terminate the encounter;"

3.  The officer was in uniform and did not tell Monroe he could terminate the encounter;

4.  The encounter was at Monroe's home and he was concerned neighbors would view him "as a snitch;"

5.  Monroe, based on his and others' interactions with police, believed he had to comply with the officers, and the fact that he was approached at his home meant he "was not free to terminate the interaction;" and

6.  Monroe's belief that he could not terminate the encounter was objectively reasonable based on "[t]he state of relations between law enforcement and members of minority communities."

A seizure does not occur, and the Fourth Amendment is not implicated, when an officer merely "approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). To elevate such an encounter to a seizure, a reasonable person must feel he is not free to disregard the officer and terminate the encounter. *Id.* This objective determination is made by "taking into account all of the circumstances surrounding the encounter." *Id.* at 437. Thus, to survive a Rule 12(b)(6) motion, it must be plausible on its face that the facts alleged in Monroe's complaint state a claim to relief (i.e., establish a seizure).

The district court properly concluded that Monroe's subjective beliefs were irrelevant in assessing whether a reasonable

person would have felt free to terminate the encounter. Monroe attempts to circumvent the objective standard by stating that if his beliefs are shared by a sufficient proportion of the population then his belief is objectively reasonable. It is important to note what rule Monroe is asking this court to adopt. To agree that Monroe's subjective belief that he was not free to terminate the encounter was objectively reasonable because relations between police and minorities are poor would result in a rule that all encounters between police and minorities are seizures. Such a rule should be rejected. A similar argument was rejected in *United States v. Analla*, 975 F.2d 119 (4th Cir. 1992). In *Analla*, the defendant argued it was objectively reasonable for him to believe he could not terminate a consensual encounter based on his experience with police. *Id.* at 124. This claim was rejected because the analysis is an objective one. *Id.* Thus, while Monroe's subjective beliefs may be facts, they are irrelevant facts that neither plausibly give rise to a right to relief nor suggest there are discoverable facts that may plausibly give rise to a right to relief.

The remaining facts in the complaint regarding the alleged seizure do not satisfy the *Twombly* test either. First, Officer Mooney's failure to tell Monroe that he could terminate the encounter has been rejected as a means of establishing a seizure, and does not imply there are discoverable facts that establish otherwise. *Id.* (citing *INS v. Delgado*, 466 U.S. 210, 216 (1984)). Second, the allegations that Monroe was "coerced," that his belief was "objectively reasonable," and that the encounter "was not [ ] consensual" are legal conclusions, not facts, and are insufficient. *Bass*, 324 F.3d at 765. The remaining two facts—that Officer Mooney was in uniform and he approached Monroe at his home—merely describe many consensual encounters, are insufficient to survive a Rule 12(b)(6) motion, and do not imply there are other discoverable facts that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Thus, the district court did not err in dismissing Monroe's Fourth Amendment claim.

### C.    Equal Protection Claim

The district court dismissed Monroe's equal protection claim stating, "that (1) when a victim of a crime provides investigators with a description of her assailant, (2) that description includes the assailant's race and gender, and (3) investigators then act on that description, there is no express racial classification." Thus, citing *Brown v. City of Oneonta*,[4] the district court held the Equal Protection Clause was not implicated. Monroe argues that this reasoning was rejected in *Shelley v. Kraemer*, 334 U.S. 1 (1948), and *Evans v. Newton*, 382 U.S. 296 (1966) (both holding that judicial enforcement of private restrictive covenants based on race amounted to government action violative of the Equal Protection Clause). Monroe argues that because the Equal Protection Clause prohibits all racial classifications and because officers stopped Monroe because he was black, the Equal Protection Clause was implicated and the officers' actions are subject to strict scrutiny. Monroe also claims the City's argument—that race was but one factor among many—was rejected by *Grutter v. Bollinger*, 539 U.S. 306 (2003).

---

[4]Although *Brown v. City of Oneonta* was criticized by Judge Calabresi in his dissent from denial of rehearing of the case en banc, *see Brown v. City of Oneonta*, 235 F.3d 769, 783, 785-86 (2d Cir. 2000) (Calabresi, J., dissenting), and in several academic journals, *see, e.g.*, Bernard E. Harcourt, *Rethinking Racial Profiling: A Critique of the Economics, Civil Liberties, and Constitutional Literature, and of Criminal Profiling More Generally*, 71 U. Chi. L. Rev. 1275, 1344-46 (2004); Richard A. Primus, *Equal Protection and Disparate Impact: Round Three*, 117 Harv. L. Rev. 493, 511-13 (2003); R. Richard Banks, *Race-Based Suspect Selection and Colorblind Equal Protection Doctrine and Discourse*, 48 UCLA L. Rev. 1075 (2001), it has not been judicially cited or discussed either in concurrence or dissent, except in its state court counterpart, *Brown v. State*, 841 N.Y.S.2d 698 (N.Y. App. Div. 2007). Because of fundamental differences in the evidence in this case, as compared with the facts in *Brown*, disapproval of *Brown* is almost totally irrelevant to this dispute. Indeed, Judge Calabresi's dissent, when fairly interpreted, supports, rather than disparages, the racial classification result reached by the district court in this litigation.

The Equal Protection Clause "provides that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'" *Fisher v. King*, 232 F.3d 391, 399 (4th Cir. 2000) (quoting U.S. Const. amend. XIV, § 1). The Clause "'is essentially a direction that all persons similarly situated should be treated alike.'" *Id.* (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). An equal protection violation occurs in one of two ways: (1) when the government explicitly classifies people based on race, or (2) when a law is facially neutral, but its administration or enforcement disproportionately affects one class of persons over another and a discriminatory intent or animus is shown. *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 818-19 (4th Cir. 1995). Monroe alleges the City explicitly classified him based on race, and its actions are subject to strict scrutiny.

The City did not so classify Monroe on the basis of his race. The officers in this case did not approach Monroe because he was African-American; rather, Monroe was approached because he matched the description of the suspect given by several victims. This is not a case in which police created a criminal profile of their own volition and decided which characteristics, such as race, that the criminal possessed. Nor is this a situation where police were faced with conflicting or uncertain evidence as to the assailant's race and made the decision to pursue only African-Americans. Rather, as earlier indicated, the police decided to approach Monroe based on the similarity between him and the several elements of the victims' descriptions, not because of a plan to investigate African-Americans. Certainly the description included the fact that the suspect was African-American, but the officers were not the source of that portrayal. Instead, that description came from private citizens—the several victims of a sex crime reciting facts as they existed when the violent felony was being committed.

The *Grutter* decision itself illustrates why there is no invidious racial classification in this case. In *Grutter*, the Univer-

sity of Michigan Law School, in furtherance of its purported academic goals, bottomed at least in part on student body diversity, exercised its academic freedom "to *make its own judgments* as to . . . the selection of its student body" based on the race of applicants. 539 U.S. at 329 (emphasis added). Here, however, the officers did not exercise their own judgment in the selection of the suspect. Unlike in *Grutter*, there was no conscious choice made on the part of officers to label the suspect as black—the officers played no role in deciding what characteristics the suspect possessed. Instead, officers merely recorded facts as they existed and conducted an investigation based on those facts.

The Equal Protection Clause requires an "express racial classification," which occurs when *the government* distinguishes among the citizenry on the basis of race. *See Shaw v. Reno*, 509 U.S. 630, 643 (1993). And, it is clear the officers in this case made no such distinction when establishing the suspect's characteristics—any descriptive categorization came from the rape victims who described their assailant.

Monroe's reliance on *Shelley* for the proposition "that state action which incorporates a privately originated, race-based, classification . . . constitute[s] impermissible race-based discrimination by the government" proves too much. Monroe's interpretation of *Shelley*, taken to its furthest bounds, could result in almost all private acts taken into account by government actors being deemed state action. But the Supreme Court has never taken *Shelley* this far. In *Shelley*, the Supreme Court decided whether judicial enforcement of restrictive covenants, "which [had] *as their purpose* the exclusion of persons of designated race or color from the ownership or occupancy of real property," constituted government action. 334 U.S. at 4 (emphasis added). These covenants were *purposefully* created by private actors to deny African-Americans the right to own property, and were only effective to the extent they were enforced by the judiciary. *Id.* When a victim describes an assailant, however, she is neither singling out a racial group

on the basis of personal choice, nor purposefully doing so in an effort to deny that racial group a constitutional right. Instead, the victim is merely describing facts for the purpose of apprehending a known criminal. *Shelley* is inapplicable.

A recent Supreme Court case, *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), further illustrates the absence of a racial classification in this case. After the September 11, 2001, attacks, federal agents began an investigation "to identify the assailants and prevent them from attacking anew." *Id.* at 1943. Javaid Iqbal, a Pakistani Muslim, was one of numerous individuals detained. *Id.* at 1942-43. Iqbal was arrested on charges of fraud and conspiracy, pled guilty, served his jail term, and was removed to Pakistan. *Id.* at 1943. Following his removal, Iqbal filed a *Bivens* action[5] against dozens of federal officials. *Id.* Among other allegations, Iqbal claimed that these federal officials labeled him "a person of high interest on account of his race, religion, or national origin, in contravention of the First and Fifth Amendments." *Id.* at 1944. The district court denied the defendants' motion to dismiss for failure to state a claim, and the court of appeals affirmed. *Id.* The Supreme Court granted certiorari and reversed. *Id.* at 1945.

Analyzing Iqbal's complaint under *Twombly*, the Supreme Court considered whether the factual allegation that government officials "arrested and detained thousands of Arab-Muslim men . . . as part of its investigation of the events of September 11" plausibly suggested an entitlement to relief for invidious discrimination. *Id.* at 1951 (omission in original). The Court held it did not. *Id.* at 1951-52. Specifically, the Court noted that Arab-Muslim men were responsible for the September 11 attacks, and "[i]t should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab

---

[5]*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims." *Id.* at 1951. The same is true in this case. Because of the victim's racial identifications, the resulting "incidental" impact of police investigations on young, black men in the Charlottesville community did not stem from an explicit government classification, at least for purposes of equal protection jurisprudence.

Because we agree with the district court's finding of no express governmental racial classification in this case, Monroe's equal protection claim is foreclosed. Moreover, although the factual record may not have been completely developed below, we have little doubt that the challenged investigation would survive strict scrutiny analysis based on the undisputed facts now in the record.

To survive strict scrutiny, a racial classification must (1) be narrowly tailored and (2) further a compelling government interest. *Grutter*, 539 U.S. at 326. The government's interest in protecting the citizenry from crime is without question compelling. *Schall v. Martin*, 467 U.S. 253, 264 (1984). Thus, the only remaining issue would be whether the investigation in this case was narrowly tailored to further that compelling interest, and, without argument, it was. The use of race was but one "pertinent element" or characteristic of the suspect. *See Grutter*, 539 U.S. at 335 (permitting the use of race in the school's admissions process when it was only one factor of many considered). Further, the use of race and how much weight it imposed upon the investigation was flexible in light of all the facts presented to the officers. Rather than a single victim or a witness recanting with hesitation or uncertainty as to the assailant's race, officers were told by several unrelated rape victims that their assailant was undoubtedly black. In addition, this was not a dragnet that attempted to question every black male in the Charlottesville area. Instead, officers approached those individuals who matched the description of the suspect and who sensitized the officers' investigatory suspicions by being picked up on a separate sexual offense or by

being reported to police via Crimestoppers, among other ways. According to the 2000 U.S. Census there are several thousand black males in Charlottesville, but police questioned only 190 individuals over a period of several years. Thus, the challenged investigation was narrowly tailored to further the government's compelling interest.

Returning to *Ashcroft v. Iqbal*, we note that the Supreme Court's language on the issue of the investigatory process is instructive in our analysis of the legitimacy of the City's activities. Even though thousands of Arab-Muslim men were investigated in *Iqbal*, the Supreme Court deemed this insufficient to render a legitimate investigatory process unconstitutional. This leaves no doubt as to the justifiability of the City's investigation. In accord with a compelling interest to detect and prevent crime, officers narrowed their investigation to only those individuals who reasonably matched the descriptions given by the victims. The officers then further narrowed their investigation, as noted above, to only those individuals who came to their attention as potential suspects. Because the description of the assailant included being a young-looking black male, it is no surprise that the officers' investigation almost certainly produced a disparate but incidental impact on young, black males, even though the purpose of the investigation was to target neither African-Americans nor males.

### III.

For the foregoing reasons, we hold that the district court did not err either in denying Monroe's motion for class certification, or in dismissing Monroe's Fourth and Fourteenth Amendment claims.

*AFFIRMED*