■ AMERICAN ASSOCIATION OF BIOANALYSTS et al., Respondents-Appellants, v NEW YORK STATE DEPARTMENT OF HEALTH et al., Appellants-Respondents. [906 NYS2d 356]—

---

Rose, J. Appeals (1) from a judgment of the Supreme Court (Sheridan, J.H.O.), entered September 30, 2008 in Albany County, which, among other things, declared the costs includable in certain annual inspection and reference fees assessed by defendant Department of Health, and (2) from an order of said court, entered June 22, 2009 in Albany County, which denied plaintiffs' motion to amend the judgment.

Plaintiffs are a trade association and a number of its clinical laboratory members that were required to pay inspection and reference fees to defendant Department of Health because they were located in or accepting specimens from New York State (*see* Public Health Law, art 5, tit V). The Department is authorized to impose these annual fees in an amount not exceeding the actual cost of operating and administering the clinical laboratory inspection and reference system program mandated by Public Health Law § 576 and further defined in Public Health Law § 571 (3) (hereinafter the program). The program is operated and administered by the Department's Wadsworth Center, which also performs routine examinations and analyses, as well as original investigations and research in fulfillment of the Department's numerous other responsibilities regarding public health (*see* Public Health Law § 500). Program work was dispersed throughout the Wadsworth Center's six divisions and more than 30 laboratories, with none of them exclusively dedicated to it. Plaintiffs commenced this action to obtain a declaration that the fees imposed for fiscal years 1998-1999 through 2005-2006 exceeded the Department's actual costs of operating the program in violation of Public Health Law § 576 (4), and to annul and recover them.

When plaintiffs' action first came before us, it was revealed that the Department had not kept contemporaneous records of the actual costs of operating the program as required by Public Health Law § 576 (4) (b) and (e), and defendants argued that it

would be unduly burdensome to require them to disclose the expenditures of the various divisions and laboratories of the Wadsworth Center that had been charged to plaintiffs. We required them to disclose these costs, however, and held that the burden of doing so was "solely due to defendants' failure to abide by statutory mandate for the years in question" and that "their laxity fueled the complexity of this litigation" (12 AD3d 868, 869 [2004]). Later, when the parties appealed the denial of their cross motions for summary judgment, we treated this matter as a hybrid action/special proceeding with the application to annul the fees being the CPLR article 78 portion. We then held that the words "actual costs" are used in Public Health Law § 576 (4) (b) and (e) to distinguish them from estimated costs and to refer to the costs necessarily incurred by the Department in operating the program during a particular fiscal year (33 AD3d 1138 [2006]). Inasmuch as there was no dispute that the Department had failed to keep the records necessary to compute the actual costs of the program and had used program funds to pay nonprogram expenses of the Wadsworth Center, we determined that the fee assessments were arbitrary and capricious as a matter of law (*id.* at 1140-1141). Nonetheless, because the Department claimed to have reconstructed the costs of the program by surveying the Wadsworth Center's staff and compiling their estimates of the attributable personnel time, equipment and materials, we affirmed the finding of Supreme Court (Tomlinson, J.) that those surveys were sufficient to raise questions of fact as to the amount of any refund of overcharges. Thus, we left it to Supreme Court to determine, as a matter of fact after trial, what costs were properly chargeable to the clinical laboratories for the years in question here (*id.* at 1141).

At trial, Supreme Court (Sheridan, J.H.O.) placed the burden upon defendants to present competent, legally sufficient evidence in support of their claimed actual costs, but maintained plaintiffs' ultimate burden of persuasion as to any overcharge. Defendants then presented the results of a second cost survey that was conducted after we rendered our decision and had not been previously disclosed to plaintiffs. Supreme Court discounted the results of that survey, however, because they were based on "bald estimates" having little probative value, and the court found that defendants had included costs that were not reliably established or proven to be reasonably necessary for the operation of the program. The court then remanded the matter to the Department for recalculation of the inspection and reference fees using only the costs found to be adequately proven as necessary for the program's operation. Defendants now appeal from that judgment, and plaintiffs appeal from a subsequent or-

der denying their application to recover prejudgment interest upon the amount of any refunds owed to them.

Following our determination in the CPLR article 78 portion of this matter that defendants' assessment of fees was arbitrary and capricious for failure to comply with the statutory mandate, the remaining issue to be determined in the declaratory judgment portion was which costs are properly includable. That factual determination depended upon whether the costs claimed by defendants were shown to be for activities, equipment and materials reasonably necessary for the program's operation, and whether the amounts of the properly includable costs were sufficiently proven. Defendants now challenge Supreme Court's delineation of the program's components as well as its determination that the cost amounts of those components were largely unproven.

Defendants first argue that Supreme Court should have determined only whether or not the Department's recalculation of the program's costs was arbitrary and capricious, and that since their survey method for reconstructing those costs was rational despite its mathematical imprecision, Supreme Court could not reject it as unreliable. We disagree. The arbitrariness of the fees imposed by the Department was previously demonstrated and affirmed by this Court. What remained to be done thereafter was not a CPLR article 78 review of the rationality of the Department's methodology, but a declaration of what costs of the program were sufficiently proven as a setoff against the full refund of fees claimed by plaintiffs. Nor was the court required to merely defer to defendants' methodology because, in reconstructing the program costs, the Department was not "acting pursuant to its authority and within its area of expertise" (*Matter of Riverkeeper, Inc. v Johnson*, 52 AD3d 1072, 1074 [2008], *lv denied* 11 NY3d 716 [2009]). The Department had statutory authority only to keep contemporaneous records of actual costs and none of its regulations contemplates or permits basing the program's fees upon retrospective reconstruction of its costs (*see* 10 NYCRR 58-3.1—58-3.6). Unlike here, the governmental agencies in the cases cited by defendants in arguing for deference for their methodology were interpreting and implementing their own regulations in article 78 proceedings (*see e.g. Matter of New York Assn. of Homes & Servs. for Aging v Commissioner of N.Y. State Dept. of Health*, 87 NY2d 978, 982 [1996], *revg on dissenting ops of Crew III and Casey, JJ.*, 212 AD2d 163, 170-172 [1995]). In addition to being unsupported by any regulation, reconstruction of the program's cost was not an exercise of the Department's expertise in public health matters

and was performed only for purposes of this litigation (*see Parker v Office of Personnel Mgt.*, 974 F2d 164, 166 [Fed Cir 1992]).

Accordingly, Supreme Court applied the appropriate standard here and properly assessed whether the costs alleged were necessary for the statutorily mandated program and whether reliable factual evidence supported their assessment (*see Jewish Reconstructionist Synagogue of N. Shore v Incorporated Vil. of Roslyn Harbor*, 40 NY2d 158, 163 [1976]; *Matter of Phillips v Town of Clifton Park Water Auth.*, 286 AD3d 834, 835 n [2001]). Following such a nonjury trial and taking into account "that the trial judge had the advantage of seeing the witnesses" (*Northern Westchester Professional Park Assoc. v Town of Bedford*, 60 NY2d 492, 499 [1983] [internal quotation marks and citation omitted]), "we independently review the weight of the evidence and may grant the judgment warranted by the record, while according due deference to the trial judge's factual findings" (*Charles T. Driscoll Masonry Restoration Co., Inc. v County of Ulster*, 40 AD3d 1289, 1291 [2007] [internal quotation marks and citation omitted]; *see Brown v State of New York*, 45 AD3d 15, 20-21 [2007]). Further, we will not disturb the trial court's decision "unless it is obvious that the court's conclusions could not be reached under any fair interpretation of the evidence" (*Thoreson v Penthouse Intl.*, 80 NY2d 490, 495 [1992] [internal quotation marks and citation omitted]; *see Mazza v Fleet Bank*, 16 AD3d 761, 762 [2005]; *Federated Conservationists of Westchester County v County of Westchester*, 304 AD2d 787, 788 [2003], *lv denied* 1 NY3d 502 [2003]).

Here, Supreme Court had several reasons to question the reliability of the cost estimates made by defendants' witnesses and give them little weight. First, defendants refused to disclose the documents used to compile the summary of the second survey's estimates of costs even after the court advised that the lack of documentation would affect the weight given to them. Second, the estimates followed no uniform or appropriate standards, were subject to no oversight or quality control to assure consistency, and were founded upon discredited and overbroad definitions of what constitutes activities attributable to the program. Third, there was evidence that defendants had persisted in including improper costs in the second surveys. Fourth, the Department offered no contemporary records of actual costs to at least partially confirm the accuracy and reliability of the method used to reconstruct those costs. Finally, this litigation gave defendants a strong motive to include as many costs as possible in order to justify the fees imposed. The Director of the Wadsworth Center conceded that, before the survey reconstruc-

tion of costs, most of its staff had not realized that they were performing activities for the program. The Deputy Director who revised the first survey's definitions of cooperative research and other components of the program acknowledged that those definitions were prepared in response to this litigation and that it was up to individual staff members to decide what activities to include in each category. There also was testimony by the Director and other witnesses indicating that the Department's assessments had been computed to include all possible costs of the Wadsworth Center, even if only remotely related to the program. For example, the Director testified that, in his view, all of the Wadsworth Center's research is includable as a cost of the program as long as it somehow relates to standards or development of laboratory methods without regard to whether such methods are ever used by the clinical laboratories. In addition, the Department's redefinition of cooperative research, a major component of the program, stated that such research is not limited to the Wadsworth Center's laboratories that "conduct proficiency testing, laboratory inspection, review permit applications, or currently conduct clinical laboratory analyses." The Department's intention to shift as many costs as possible onto the clinical laboratories was further revealed in the testimony that the Director had once boasted that he had been able to transfer 17% of the Wadsworth Center's budget to the clinical laboratories. Thus, we conclude that Supreme Court's finding that the cost amounts based upon the second survey were unreliable was reached upon a fair and reasonable interpretation of the evidence (*see e.g. Chase Manhattan Bank v Douglas*, 61 AD3d 1135, 1137 [2009]).

We next consider Supreme Court's determinations of the properly includable cost components of the program for the years at issue here. Beginning with the component of cooperative research, defendants assert that they complied with the definition approved by this Court as to what research is properly includable and they argue that, at trial, they proved that their claimed costs came within that definition. Cooperative research is one of several activities included in the statutory definition of the program's reference system, but it is not itself defined by statute.[1] On the last appeal, we held that Supreme Court had sufficiently deferred to the Department's expertise in defining

---

1. Public Health Law § 571 (3) defines the "reference system" as "a system of periodic testing of methods, procedures and materials of clinical laboratories and blood banks, including, but not limited to, the distribution of manuals of approved methods, inspection of facilities, cooperative research, and periodic submission of test specimens for examination."

cooperative research as that which directly involves the testing of methods, procedures and materials used by clinical laboratories, and in stating that while this may include new methods, procedures and materials, it does not include general biomedical research which might show a need for laboratory testing. We accepted this definition because it assured that the chargeable costs for research would include only those necessarily incurred in operating the program. Because this definition and its underlying rationale are controlling here, we conclude that Supreme Court's determination to disallow the research costs claimed by defendants was reached upon a fair interpretation of the evidence.

As we have noted with respect to the surveys, the testimony of the Department's scientists revealed that they could not meaningfully distinguish research reasonably necessary for the program from general biomedical research undertaken at their discretion in fulfillment of the Department's numerous other research responsibilities. Not only was the redefinition of cooperative research used by the scientists in completing the second survey overbroad, but they read it to include the costs of detecting new disorders and emerging diseases, assessing environmental and other health risks, and investigating the role of genetic factors in a variety of diseases. Research projects were selected not based upon their usefulness in regulating the quality of clinical laboratories, but to obtain federal grants and provide greater understanding of diseases and other health hazards. Moreover, there was no evidence of any oversight to assure that the research projects chosen were necessitated by, or appropriate for, the activities of clinical laboratories. Although there was testimony about research into developing new testing methods, defendants' witnesses conceded that none of the methods developed were ever used by clinical laboratories. The record also supports Supreme Court's observation that although the Department's scientists had obtained federal grants and commercially viable patents for many of the research projects, defendants failed to sufficiently support their claim that those funds were actually credited against the research costs attributable to the program. We agree with Supreme Court that a fair interpretation of this evidence is that none of the activities claimed for cooperative research were supported by reliable evidence or shown to be necessary for the program's operation.

We are similarly unpersuaded by defendants' related argument that Supreme Court erred in restricting the way in which includable cooperative research can be conducted by defining "cooperative" as working in association with a nongovernmen-

tal laboratory, such as a clinical laboratory. Defendants assert that the Department's reading of "cooperative" to include all research—even if it is conducted without collaboration with other institutions or entities—was reasonable and entitled to deference. Supreme Court, however, was required to defer to this expansive interpretation only if it was not irrational or unreasonable (*see Matter of Lighthouse Pointe Prop. Assoc. LLC v New York State Dept. of Envtl. Conservation*, 14 NY3d 161, 176 [2010]; *Seittelman v Sabol*, 91 NY2d 618, 625-626 [1998]; *Matter of Emigrant Bancorp, Inc. v Commissioner of Taxation & Fin.*, 59 AD3d 30, 32-33 [2008]). Here, it was precisely because defendants' witnesses were shown to have used this expansive definition of "cooperative" that Supreme Court properly declined to defer to the Department's view. In this regard, the Director testified that virtually all research is cooperative in the sense of building upon the work of others and, thus, the Department's working definition failed to give any significance to the statutory term "cooperative." By contrast, Supreme Court's view of cooperative research is reasonable and appropriate because it is consistent with the plain meaning of the word, and because it recognizes the well-accepted understanding that government-supported cooperative research is that which involves collaboration with an outside entity (*see e.g.* 6 USC § 189 [d]; 7 USC §§ 450a, 3222 [a] [4]; 10 USC § 2350a [i] [1]; 15 USC § 638 [e] [7]; §§ 4301-4306; 16 USC § 753a; 21 CFR 56.114; 45 CFR 46.114). Inasmuch as the evidence showed that none of the research claimed by defendants was conducted in association with any outside entity, it was not cooperative as required by the statute, and Supreme Court properly disallowed all of the Department's research costs on this basis as well.

Regarding the related component of method validation, we affirmed Supreme Court's earlier holding that, as a matter of law, the costs of approving or validating testing methods are includable if the methods are used by the clinical laboratories. Defendants argue, however, that Supreme Court erred in failing to defer to the Department's broader view of method validation, which included validation of testing methods not used by the clinical laboratories. In our view, however, Supreme Court properly declined to defer to the Department in this regard because the relevant holding was established as law of the case, and defendants' contrary interpretation is irrational for including validation activities wholly unrelated to the testing methods used by clinical laboratories. Since defendants' proof established only the costs of validating methods developed and used internally by the Department, we agree with Supreme Court's conclusion that "the reviewer of this record will search in vain

for any assay or method discussed or investigated that was actually used or proposed to be used by the regulated laboratories." Thus, all costs for method validation were properly disallowed.

As for defendants' claim for personal and nonpersonal costs for laboratory inspections and proficiency testing, Supreme Court found there to be sufficient evidence that this component was reasonable and necessary for the operation of the program. The court, however, also found that, due to the previously discussed lack of standards and consistency in defendants' survey method of allocating costs between the program and the Wadsworth Center's numerous other laboratory activities, the evidence failed to show that those costs were estimated with sufficient accuracy and reliability except where such activities involved 100% of a scientist's time and at least 90% of the use of equipment and materials. Thus, Supreme Court's decision to eliminate the marginal allocations based upon those estimates was reasonable and supported by the evidence.

Defendants next contend that Supreme Court improperly limited the category of indirect costs. In settling an earlier action against the Department, plaintiffs stipulated that, for all future rate periods, they would not challenge the Department's use of indirect cost percentages set forth in its agreements with federal agencies regarding the percentages to be used in applying for federal grants. The Department's agreed-upon federal rates for the fiscal years in question ranged from 40% to 45%. Supreme Court concluded that defendants were bound by those percentages because defendants had contended for them in the earlier stages of this action. We agree. The doctrine of judicial estoppel precludes a party "from inequitably adopting a position directly contrary to or inconsistent with an earlier assumed position in the same proceeding" (*Maas v Cornell Univ.*, 253 AD2d 1, 5 [1999], *affd* 94 NY2d 87 [1999]; *see Matter of Hartsdale Fire Dist. v Eastland Constr., Inc.*, 65 AD3d 1345, 1346 [2009], *lv denied* 14 NY3d 701 [2010]). Here, defendants added 40% for indirect costs in their original calculations and, when plaintiffs argued for a lower percentage, they asserted that the federal percentages were controlling. Although defendants' brief on the last appeal stated that the Department's formula for calculating "actual" indirect costs would produce percentages ranging from 66.13% to 74.82%, it can be fairly read as adhering to the lower rate because it acknowledged that the Department had agreed to use 40% in its original assessment and asserted that this benefitted plaintiffs. This posture reasonably led Supreme Court to conclude that the agreed-upon percentages were binding on both plaintiffs and defendants. De-

fendants' apparent reliance upon the federal percentages also led plaintiffs to reasonably believe that it was not necessary to challenge the higher percentages cited in opposition to plaintiffs' motion. As a result, we will not disturb Supreme Court's decision to preclude defendants from taking an inconsistent position at trial.

In the category of miscellaneous costs, Supreme Court allowed some and disallowed others, but defendants take issue only with the disallowance of the fees incurred by the Department in obtaining an exemption from the requirements of the Clinical Laboratory Improvement Act of 1988 (see 42 USC § 263a).[2] Payment of this fee exempts clinical laboratories located within New York State from also having to comply with federal laboratory regulations that otherwise would apply to them individually (see 42 USC § 263a [d], [e]). Although the record does not clearly indicate how many of the regulated clinical laboratories are located outside New York State, it does show that only laboratories within New York State are benefitted by the exemption while all laboratories are apportioned a share of the exemption fee. At trial, defendants argued that the Department's payment of this fee was beneficial to all clinical laboratories because their individual fees would be substantially greater without the exemption, but Supreme Court disagreed. Upon our review of the record, we conclude that—as plaintiffs argue—the relevant issue is not whether the exemption was beneficial to the laboratories, but whether it was a cost necessarily incurred in the operation of the program. Here, there is no evidence that the exemption was in any way necessary for the program's operation. Thus, it was properly disallowed.

Finally, we find no merit in plaintiffs' argument on its appeal that Supreme Court erred in denying their application for prejudgment interest upon the refund that they expect to recover from the Department. Since the court remanded the matter for recalculation of fees and made no determination as to the amount of the refund to be made by the Department, there has not been—nor will there be—a judicial award upon which prejudgment interest could be granted (see CPLR 5001 [a]; Manufacturer's & Traders Trust Co. v Reliance Ins. Co., 8 NY3d 583, 588-589 [2007]). Accordingly, plaintiffs' application was properly denied.

Peters, J.P., Lahtinen, McCarthy and Egan Jr., JJ., concur. Ordered that the judgment and order are affirmed, without costs.

---

2. Defendants have abandoned any claim that the remaining miscellaneous items were improperly disallowed by failing to address those issues in their brief (see Matter of Hargett v Town of Ticonderoga, 25 AD3d 981, 981 n [2006]).